**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

ORTHOPEDIATRICS CORP. and
ORTHEX, LLC

        Plaintiffs,

  v.

WISHBONE MEDICAL, INC. and NICK A.
DEETER,

        Defendants.

Case No. 3:20-cv-000929

1

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION
TO DISMISS PURSUANT TO FRCP 12(b)(6)**

Defendants, WishBone Medical, Inc., and Nick A. Deeter, by and through the undersigned counsel, and, pursuant to Federal Rules of Civil Procedure 12(b)(6), file this Brief in Support of their Motion to Dismiss Counts I through VI of Plaintiffs' Complaint.

## I. INTRODUCTION AND FACTUAL BACKGROUND

1.     WishBone Medical, Inc. ("WishBone") is a Warsaw, Indiana, based pediatric orthopedic company focused globally on the unmet needs of children suffering from orthopedic issues. WishBone seeks to provide anatomically appropriate, innovative implants and instruments to surgeons and their patients.

2.     Nick A. Deeter ("Deeter") is the co-founder of WishBone, where he has served since 2017 as Chairman of the Board and Chief Executive Officer. Deeter previously founded Plaintiff, OrthoPediatrics, Corp. ("OrthoPediatrics"), where for 8 years, he served as Chairman of the Board, Chief Executive Officer and Managing Director.

3.     Tamer Isin ("Isin") is a native of Turkey and a principal of IMED Surgical, LLC ("IMED"), which is the plaintiff in presently-pending litigation against OrthoPediatrics and Orthex, as more particularly described below.

4.     Wishbone ExFx, LLC ("Wishbone LLC"), is an Oklahoma limited liability company, which owns an interest in IMED Surgical, LLC. One of Wishbone LLC's members is Nick Deeter.  Other than having Nick Deeter as in interest holder, IMED and WishBone Medical, Inc. are not affiliated entities.

5.     Between 2007 and 2009, Isin developed a method involving surgical fixators and software for use by orthopedic surgeons to re-align broken and deformed bones. Isin further developed novel software that could both automatically acquire the required data from x-rays and,

more significantly, automatically **calculate** the required fixator strut lengths. Under Isin's method, the surgeon "pointed and clicked" a cursor on defined points of an x-ray and the software did the rest.

6.      In addition to his software, Isin also developed a fixator with eight struts that he named the "Adam Frame." The Adam Frame in combination with Isin's software was called the "Adam Frame Computer Aided External Fixator."

7.      Isin applied for a Turkish patent on his "point and click method" in January 2011, which issued in August 2015 as Turkish Patent TR2012 01064 B. Isin also filed a Patent Cooperation Treaty ("PCT") application in Turkey on January 8, 2011, which published in August 2012. Isin also registered his software with the United States Copyright Office in 2010, receiving copyright registration, TXu001721872.

8.      Isin moved to the U.S. in 2007 and sought a prominent U.S. orthopedic surgeon to help him develop, refine and commercially promote his "Adam Frame Computer Aided External Fixator."

9.      In 2010, Isin met Dror Paley ("Paley"), a world-renowned orthopedic surgeon practicing in Palm Beach County, Florida, and demonstrated his novel "point and click" method to Paley which resulted in Paley, through his now dissolved company, Paley LLC, entering into a written consulting agreement with Isin's company, IMED Surgical, LLC.

10.      Under that consulting agreement, Paley and Paley LLC promised to help IMED develop, refine and commercially facilitate the "Adam Frame Computer Aided External Fixator," which the parties re-branded as the "Adam Frame with Paley Method."

11.      Paley ultimately disavowed his promises to IMED.  In 2013, while still engaged as IMED's consultant, Paley assigned to Plaintiff, Orthex, LLC ("Orthex") an invention and patent

3

he was obligated to disclose and assign to IMED under the consulting agreement. Paley then filed successive patent applications for Orthex' benefit which ultimately ripened into United States Patent 10,258,377 ("the '377 Patent"), entitled: "Point and Click Alignment Method for Orthopedic Surgeons, and Surgical and Clinical Accessories and Devices."

12.      Isin discovered in July 2019 that Paley sold Orthex to OrthoPediatrics, including the '377 Patent, for $60 million.

13.      On October 5, 2020, IMED filed an action in the Southern District of Florida styled *IMED Surgical, LLC v. Orthex, LLC; Dror Paley; OrthoPediatrics Corp.; and Squadron Capital, LLC*, No. 1:20-cv-24065 (the "S.D. Fla. Action"), alleging inter alia, breach of the consulting agreement, and for declaratory judgment that IMED owns the '377 Patent.

14.      On October 15, 2020, the plaintiff, IMED, voluntarily dismissed the S.D. Fla. Action, due to IMED's learning of jurisdictional issues that required filing in state court.

15.      On the same day as the dismissal of the S.D. Fla. Action, IMED filed a substantially identical action in the Circuit Court for Broward County, Florida, styled *IMED Surgical, LLC v. Orthex, LLC; Dror Paley; Dror Paley, LLC; OrthoPediatrics Corp.; and Squadron Capital, LLC*, No. CACE-20-017135 (the "Florida Lawsuit"), also alleging breach of the consulting agreement, and for declaratory judgment that IMED Surgical owns the '377 Patent.[1]

16.      On information and belief, the instant lawsuit was filed by Plaintiffs in response to and in retaliation for the filing of the S.D. Fla. Action and subsequent filing of the Florida Lawsuit.

---

[1] While Plaintiffs point to the voluntary dismissal of the S.D. Fla. Action throughout the Complaint in an apparent effort to gain some unknown advantage, Plaintiffs wholly ignore the filing of the Florida Lawsuit, which occurred on the same date as the dismissal of the S.D. Fla. Action and five days before the filing of the Complaint. Interestingly, the Plaintiffs in their Motion for Expedited discovery represent to the court that IMED's S.D. Fla. Action was dismissed *sua sponte* by the court. The omission and misleading allegation suggests a deliberate effort by Plaintiffs to mislead this Court into assuming that there is no action pending against Plaintiffs in Florida involving competing claims to intellectual property.

## II.  STANDARD OF REVIEW

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 499 (7th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. See *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.  Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible (sic) probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject matter of the case to present a story that holds together."). When deciding a motion to dismiss under Rule 12(b)(6), the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *KatzCrank v. Haskett*, 843 F.3d 641, 646 (citing *Iqbal*, 556 U.S. at 662, 663); *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

Paragraph 9 of the Complaint alleges that each of Plaintiffs' supplemental jurisdiction claims is based on Defendants' disparaging comments: "Furthermore, WishBone's and/or Deeter's disparaging comments and other actions, described in greater specificity below, violate the Lanham Act; breach the non-disparagement clause in Deeter's severance agreement; are

defamatory *per se*; and tortiously interfere with Plaintiffs' current and prospective contractual and business relationships." As described more particularly below, Plaintiffs have failed to state claims for which the Court may grant relief with respect to Counts I through VI.

### III.  ARGUMENT

**A.    Plaintiffs' Complaint Fails to State a Claim Upon Which Relief Can Be Granted for Patent Infringement**

In its Complaint, Plaintiffs allege that WishBone has committed direct, contributory, and induced infringement of the '377 Patent. The '377 Patent claims a method to implement intended manipulation of an external fixator frame by an orthopedic professional.

Claim 1 sets forth the necessity for an "orthopedic professional" to perform the steps of the invention and the remaining claims of the '377 Patent all depend from Claim 1, and therefore, all of the claims require an "orthopedic professional" to perform the method. Formal claim construction is not required to reach the conclusion that the '377 Patent is for performing a method of manipulation of a fixator frame by an orthopedic professional.

As will be shown below, Plaintiffs' Complaint fails to meet the facial plausibility requirements set forth in *Iqbal* and *Twombly*. Plaintiffs' Complaint does not allege that anyone ever performed the steps as claimed. Therefore, Count I alleging patent infringement must be dismissed because it fails to state a claim upon which relief can be granted for direct or indirect patent infringement.

### 1.    Plaintiffs Failed to State a Claim for Direct Infringement

Plaintiffs' direct infringement claim should be dismissed because Plaintiffs have failed to allege WishBone or an orthopedic professional within Wishbone has performed the steps as required by Claim 1 of the '377 Patent. The Complaint conflates the Accused System, which is only a device, with infringement of the '377 Patent, which is a method. Any allegations of direct

infringement that Plaintiffs attempted to make in the Complaint have been made in a conclusory manner and cannot support a claim of infringement against WishBone. As stated above, all reasonable inferences to facts will be construed as true, but conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *KatzCrank v. Haskett*, 843 F.3d 641, 646 (citing *Iqbal*, 556 U.S. at 662, 663). In other words, merely stating that WishBone infringed the '377 Patent is not enough upon which to make a claim of infringement. For instance, at Paragraph 8 of the Complaint, it states "Wish[B]one's infringement is knowing and intentional." This is nothing more than a bare statement that WishBone allegedly infringed and does nothing other than recite a necessary element. Such bare allegations of infringement are pervasive through the Complaint and are not enough to substantiate claims of patent infringement.

Plaintiffs' Complaint refers extensively to the Accused System, but never pleads that WishBone has practiced the claimed method using that system. For instance, Paragraphs 43-48 merely state that WishBone has received FDA approval for the Accused System and its website shows the Accused System. At no point throughout the Complaint is there any allegation that WishBone performs the steps of Claim 1 to directly infringe the '377 Patent. These Paragraphs merely recite that an Accused System exists. To directly infringe the '377 Patent, WishBone must perform all of the claimed steps, including the steps that require the specifically claimed apparatus(es). At no point in its Complaint do Plaintiffs allege that an individual at WishBone has done this. For instance, Paragraphs 66-68 the Complaint all follow the same format and state "The Accused System performs steps…" then proceeds to recite various steps. However, it is not the "Accused System" that needs to perform the steps, but a Defendant named in this suit. Such a statement that one of Defendants performs the necessary steps toward infringement is nowhere to be found. For example, step "c)" of the method states "taking at least two medical images of a

patient…" and step "d)" states "marking **by said orthopedic professional**…"   Again, as mentioned before, an "orthopedic professional" must perform many of the steps and that would necessary be a natural living person, yet Plaintiffs identify no such individual.

### 2.      Plaintiffs Failed to State a Claim for Indirect Infringement

Plaintiffs attempt to make allegations of induced and contributory infringement through Paragraphs 69-72, but does not plausibly allege facts to support either. To demonstrate inducement of infringement, the patentee must establish "first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 697-98 (Fed. Cir. 2008). "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice."  *DSU Med. Corp. v. JMS Co.*, 471, F.3d 1293, 1306 (Fed. Cir. 2006). Conspicuously absent is any allegation of direct infringement within the Complaint, so the first step needed to allege induced infringement is missing. Moving to the element of intent, Plaintiffs merely parrot the element of intent by stating "WishBone induces infringement of the '377 Patent by actively and knowingly inducing third parties to commit acts that WishBone knows constitute infringement of the '377 Patent" at Paragraph 70 of the Complaint. However, this is just a threadbare recitation of intent with no mention of how just an Accused System infringes the method claimed in the '377 Patent. In ¶71 the Complaint states that "WishBone actively, knowingly and intentionally aids, abets, directs, encourages, or otherwise instructs third parties via the sale, offer to sell, promotions, and advertising of the Accused System, and provision of instructions regarding using such Accused System in the manner described in the asserted claims of the '377 Patent, to infringe the '377 Patent by and through their use of the Accused System." However, there is no statement within the Complaint that alleges a specific act by an orthopedic

professional, this is merely a general allegation. Plaintiffs cannot allege any orthopedic professional used the Accused System and therefore lack the underlying infringement necessary to allege induced infringement.

For contributory infringement, an infringer must know "that the combination for which his component was especially designed was both patented and infringing." *Global-Tech Appliances, Inc.* at 754, 763 (2011) (citing *Aro. Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964)). "[U]unlike a claim for induced infringement, a claim for contributory infringement does not require a showing of specific intent to cause infringement." *Unisone Strategic IP, Inc. v. Life Techs. Corp.*, 2013 U.S. Dist. LEXIS 151761, 2013 WL 5729487, at *10 (S.D. Cal. 2013). The scienter requirement for contributory infringement requires only knowledge that the supplied component will result in infringement. For contributory infringement, knowledge that an accused product be especially made or especially adapted for use in an infringement requires that the party contributing to infringement knows of the patent and that the product or activity at issue infringes. *Global-Tech* at 763.

Absent any factual allegation of how an orthopedic professional at WishBone infringes, Plaintiffs' threadbare recitation of patent infringement is purely speculative. "Factual allegations must be enough to raise a right to relief above the speculative level…." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965. The claim language clearly demonstrates that the claimed method requires both the apparatus having the claimed characteristics and an orthopedic professional. The mere existence or sale of the Accused System is not the same as performing claimed steps with the system. As is made clear on the face of the patent itself, a required element of each of the claims of the '377 patent is the orthopedic professional. Therefore, Plaintiffs have not sufficiently pleaded that WishBone directly infringed the claims of the '377 Patent because there is no allegation of

9

any orthopedic professional using the system.

### 3.    Leave to Amend the Claim of Direct Infringement Would be Futile

Count I of Plaintiffs' complaint should be dismissed without leave to amend because this cause of action cannot be saved by amendment. "Although leave to amend a complaint should be freely granted when justice so requires, *see* Fed. R. Civ. P. 15(a), the district court need not allow an amendment when there is undue delay, bad faith, dilatory motive, undue prejudice to the opposing party, or when the amendment would be futile." *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860-61 (7th Cir. 2001). "A new claim is futile if it would not withstand a motion to dismiss." *Vargas-Harrison v. Racine Unified School District*, 272 F.3d 964, 974 (7th Cir. 2001). In order to save a complaint from subsequent dismissal, Plaintiffs would have to plausibly allege that WishBone is an orthopedic medical care facility that has treated patients. Plaintiffs have not and cannot make such an allegation in good faith.

### 4.    Leave to Amend the Claims for Indirect Infringement Would be Futile

Allegations of indirect (contributory or induced) infringement of Plaintiffs' complaint should also be dismissed without leave to amend. In order to survive a subsequent motion to dismiss, Plaintiffs would have to allege sufficient facts which would allow the Court to plausibly infer not only that some underlying infringement of its '377 Patent actually took place, but that WishBone specifically intended to induce that underlying infringement. Even if Plaintiffs could plausibly allege that some underlying infringement by a third party occurred, it cannot plausibly allege in good faith that WishBone specifically intended to induce that infringement. This would also become apparent through discovery. Therefore, Plaintiffs should be denied leave to amend upon the Court granting dismissal of the indirect infringement claim of its Complaint.

**B.** **Count II of the Complaint for Unfair Competition and False Advertising Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).**

Although none of Plaintiffs' Counts is specifically denominated as a Lanham Act claim, the allegations of Count II of the Complaint bear the closest resemblance, since paragraph 11 of the Complaint states that claims for unfair competition and false advertising are brought under the Lanham Act. To be entitled to relief under section 43(a), a plaintiff must ultimately prove that: (1) the defendant made a false or misleading statement of fact in commercial advertising or promotion about its or another's goods or services; (2) the statement deceived  or was likely to deceive a substantial segment of the intended audience; (3) the deception was material; (4) the defendant caused the statement to enter interstate commerce; and (5) the statement resulted in injury to the plaintiff. *Buztronics, Inc. v. Theory3, Inc*., 2005 U.S. Dist. LEXIS 46967 (S.D. Ind. Ind'aplois 2005) citing *Zenith Electronics Corp. v. Exzec, Inc*., 182 F.3d 1340, 1348 (Fed. Cir. 1999). One additional element comes into play where a plaintiff alleges that another party's attempt to enforce its patent rights amounted to unfair competition, so as to avoid conflict between patent laws and the Lanham Act. "[B]efore a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith." *Zenith*. at 1353. In order to recover damages, plaintiff must establish that the buying public was actually deceived. See *Skil Corp. v. Rockwell Int'l Corp.*, 375 F. Supp. 777 (N.D. Ill. 1974).

To the extent Plaintiffs rely on Indiana common law with respect to Count II, in *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001), the court stated that "Indiana courts have created a cause of action for unfair competition, defined as 'the attempt to create confusion concerning the source of the unfair competitor's goods.'" citing *Westward Coach Mfg. Co. v. Ford Motor Co*., 388 F.2d 627, 633 (7th Cir. 1968), cert. denied, 392 U.S. 927, 20 L.Ed.2d 1386, 88

11

S.Ct. 2286 (1968) (citations omitted). In *Hartzler v. Goshen Churn & Ladder Co.*, 104 N.E. 34 (1914), the Indiana appellate court described unfair competition as "any conduct, the natural and probable tendency and effect of which is to deceive the public so as to pass off the goods or business of one person as and for that of another…" *Id.* at 37.

Regardless of whether Plaintiffs rely on the Lanham Act, or Indiana common law, Plaintiffs' claims for unfair competition and false advertising against WishBone and Deeter should be dismissed pursuant to Rule 12(b)(6) because Plaintiffs have not pleaded sufficient facts that would give rise to unfair competition under either the Lanham Act, or state common law. Additionally, the statements that Plaintiffs attempt to use in support of Count II cannot give rise to a claim because such claims are barred by the litigation privilege. The material allegations concerning Count II are contained within paragraphs 81 through 86 of the Complaint. Each of the material allegations of Count II specifically relates to either allegations contained in the S.D. Fla. Action, or to statements attributed to Deeter regarding the S.D. Fla. Action.

Paragraph 81 alleges: "Deeter and other WishBone employees have made false statements wrongly accusing Plaintiffs of committing theft and improperly causing harm to an inventor on, at a minimum, LinkedIn."

Response: The allegations in paragraph 81 relate to statements posted on LinkedIn, <u>after</u> the S.D. Fla. Action had been filed. Aside from the fact that Deeter never stated that Plaintiffs committed theft (that implication was made by inventor, Tamer Isin in the same LinkedIn thread), as shown below, statements pertinent to the litigation are privileged and not actionable.

Paragraph 82 alleges: "Moreover, Defendants, through WishBone's affiliate IMED, filed the meritless S.D. Fla. Action where they misrepresented ownership of the '377 patent when it was not owned by IMED thereby making false representations as to the source of the goods and as to

their affiliation or association with another."

Response: Clearly, and despite the misstatement that IMED is a WishBone affiliate[2], the allegations of paragraph 82 are in direct reference to the S.D. Fla. Action. As such, the statements are pertinent to the litigation and are privileged and not actionable.

Paragraph 83 alleges: "In sum, Defendants have made false representations both on social media and to a court that Plaintiffs' products were created, designed, and authorized by someone other than Plaintiffs."

Response: The allegations of paragraph 83 are not in addition to paragraphs 81 and 82, but are merely a summary of previous allegations. The allegations of paragraph 83 are, likewise, subject to the litigation privilege.

Paragraph 84 alleges: "As Deeter has admitted in his March 2, 2020 email to Mr. Korngold, his goal with litigation is to negatively affect OP's market share. Therefore, Defendants' actions have been deliberate, willful and malicious."

Response: The statement attributed to Deeter's March 2, 2020 email is not evidence of willfulness or malice in the context of unfair competition and false advertising. As the court in *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263 (7th Cir. 1992) noted, "Competition is ruthless, unprincipled, uncharitable, unforgiving--and a boon to society, Adam Smith reminds us, precisely because of these qualities that make it a bane to other producers." *Id.* at 1268. With respect to the allegation of false advertising, "To establish liability, a plaintiff must show that the challenged advertisement is literally false, or, if literally true or ambiguous, that it is 'misleading in context, as demonstrated by actual customer confusion.'" *BASF Corp. v. Old World*

---

[2] The Complaint alleges IMED is an affiliate of WishBone Medical Inc., a fact WishBone and Deeter intend to contest. For purposes of this Motion this Court must take the allegation as true. As a matter of disclosure to the Court, Deeter has an interest in IMED through Deeter's ownership of a limited liability company that has an interest in IMED. Other than as stated above in paragraph 4, WishBone has no affiliation with IMED.

*Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994) citing *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3rd Cir. 1993). Even if Deeter's motivation had been malicious, as alleged, such action would only go to the issue of damages if the statements covered under the litigation privilege were actionable. Plaintiffs have not made any allegation that would support a claim that Defendants' activities would give rise to liability under Count II.

Paragraph 85 alleges: "Defendants' statements on social media and to a court both are public and thus Defendants caused and directed their false or misleading statements to enter interstate commerce."

Response: Once again, the allegations are in reference to LinkedIn posts <u>after</u> the S.D. Fla. Action had been filed and are pertinent in reference to the S.D. Fla. Action, together with a direct reference to statements contained in the S.D. Fla. Action court filings. As such, the statements fall within the litigation privilege discussed below.

In *Eckerle v. Katz & Korin, P.C.*, 81 N.E.3d 272 (Ind.Ct.App. 2017), the court stated that Indiana law[3] has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements.

---

[3] Florida law is in accord. The litigation privilege applies across the board to actions in Florida, both to common-law causes of action, those initiated pursuant to a statute, or of some other origin. "Absolute immunity must be afforded to any act occurring during the course of a judicial proceeding . . . so long as the act has some relation to the proceeding." *Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So.2d 380, 383 (Fla. 2007). "It is the perceived necessity for candid and unrestrained communications in those proceedings, free of the threat of legal actions predicated upon those communications, that is the heart of the rule. The nature of the underlying dispute simply does not matter." *Id*. at 384.

"The law has long recognized that judges, counsel, parties, and witnesses should be absolutely exempted from liability to an action for defamatory words published in the course of judicial proceedings, regardless of how false or malicious the statements may be, as long as the statements bear some relation to or connection with the subject of inquiry." *Debrincat v. Fischer*, 217 So.3d 68, 69 (Fla. 2017).

Florida courts have applied the privilege not only to conduct undertaken while litigation is ongoing but also to conduct that is "necessarily preliminary" to judicial proceedings. (Citations omitted)(for the proposition that the absolute privilege "arises immediately upon the doing of any act required or permitted by law in the due course of the judicial proceedings or as necessarily preliminary thereto." *AGM Investors, LLC v. Business Law Group, P.A.*, 219 So.3d 920 (Fla. Ct. App. 2nd 2017).

*Wilkins v. Hyde*, 142 Ind. 260, 261, 41 N.E. 536, 536 (1895); *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind. Ct.App. 1998). "The reason upon which the rule is founded is the necessity of preserving the due administration of justice," *Wilkins*, 142 Ind. at 261, 41 N.E. at 536, by providing actors in judicial proceedings with the freedom to participate without fear of future defamation claims. *Van Eaton*, 697 N.E.2d at 494 (citing *Briggs v. Clinton County Bank & Trust Co*., 452 N.E.2d 989, 997 (Ind. Ct. App. 1983)). *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008). For immunity from liability to exist based on absolute privilege, the statement in question must be "relevant and pertinent to the litigation or bear some relation thereto." *Estate of Mayer*, 998 N.E.2d at 247(quoting *Stahl v. Kincade,* 135 Ind. App. 699, 707, 192 N.E.2d 493, 497 (1963)). The absolute privilege doctrine applies to defamation claims, torts related to defamation, and torts relying upon defamatory statements as proof of wrongdoing. *Estate of Mayer v. Lax, Inc*., 998 N.E.2d 238, 247 (Ind. Ct. App. 2013). "The prevailing rule is that . . . parties . . . are absolutely privileged to publish defamatory matter in the course of judicial proceedings, with the qualification that the statements must be pertinent and relevant to the case." *Briggs v. Clinton County Bank & Trust Co*., 452 N.E.2d 989, 997 (Ind. Ct. App 1983); see also *Van Eaton v. Fink*, 697 N.E.2d 490, 495 (citing *Chrysler Motors v. Graham*, 631 N.E.2d 7, 9 (Ind. Ct. App. 1994) ("Indiana law affords absolute privilege to statements made in the course of a judicial proceeding.") Whether statements made in judicial pleadings are pertinent and relevant is a question of law. Courts favor a liberal rule in favor of finding statements to be relevant and pertinent. Statements in a judicial proceeding will not enjoy an absolute privilege only if they are so palpably irrelevant to the subject matter of the case that no reasonable person could doubt their irrelevancy and impropriety. *Id*. at 247.

Other torts related to defamation, or relying upon defamatory statements as proof of wrongdoing, may also be barred by the absolute privilege. See *Hartman v. Keri*, 883 N.E.2d 774,

777 (Ind. 2008) (holding absolute privilege barred claims for libel, slander, and malicious interference with an employment contract). "The absolute privilege bars actions for defamation, negligent supervision and retention, tortious interference with a business relationship, and tortious interference with a contract." *Estate of Mayer*, at 249.

The litigation privilege also applies to allegations that are subsequently stricken from pleadings, provided that the statement otherwise satisfies the requirement that it be "palpably related" to the subject matter of the lawsuit. *Eckerle* at 283. This application is significant, here, since Plaintiffs' references to the "now-voluntarily dismissed S.D. Fla. Action" form the basis for a substantial portion of their claims, and Plaintiffs ignore the fact that the S.D. Fla. Action was refiled in Florida state court, now referred to herein as the "Florida Lawsuit." Whether the statements Plaintiffs allege were made regarding the S.D. Fla. Action, or the Florida Lawsuit, the statements, if made, were with respect to pending litigation and were privileged.[4]

Count II should be dismissed pursuant to Rule 12(b)(6) because Plaintiffs have failed to allege that Defendants have made any defamatory statement that falls outside the litigation privilege.

**C.     Count III of the Complaint for Breach of Contract Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).**

Plaintiffs' claim for breach of Deeter's severance agreement should be dismissed pursuant to Rule 12(b)(6). All of the statements Plaintiffs assert violate the non-disparagement provision are protected by the applicable litigation privilege. The basis for the application of the litigation privilege is discussed in greater detail in Section B, above, and the citations to authorities and associated arguments are incorporated herein by reference. Essentially, "The prevailing rule is that

---

[4] Since the S.D. Fla. Action was voluntarily dismissed by IMED the same day IMED filed the Florida Lawsuit, the pendency of litigation was uninterrupted at the time the alleged statements would have been made and, therefore, covered by the litigation privilege.

. . . parties . . . are absolutely privileged to publish defamatory matter in the course of judicial proceedings, with the qualification that the statements must be pertinent and relevant to the case." *Briggs v. Clinton County Bank & Trust Co*., 452 N.E.2d 989, 997 (Ind. Ct. App 1983).

The Complaint makes reference to several statements Plaintiffs attribute to Deeter in support of the claim that Deeter breached the non-disparagement provision of the severance agreement, as follows:

Paragraph 51: "For example, on March 2, 2020, Deeter sent an email to Aaron Korngold stating, in relevant part, that he was attempting to "put considerable downward pressure on the KIDS public stock." KIDS refers to OP's trading symbol on NASDAQ."

Paragraph 52: "Deeter also wrote in his March 2, 2020 email to Mr. Korngold that Deeter and WishBone "haven't spent much time on this lawsuit [Whitley Superior Court Action], but now that we are well funded, we have hired new legal counsel to file numerous countersuits," which includes the now-voluntarily dismissed S.D. Fla. Action."

LinkedIn screenshots at Paragraph 54: "Tamer, in the U.S. we say, "what goes around, comes around". OrthoPediatrics has been bullying us for years. This type of behavior always has consequences. Best of luck."

Plaintiffs allege in Count III, paragraph 92: "Deeter has breached the Severance Agreement by making disparaging false statements and comments about OP and OP's reputation to third parties, including but not limited to stating that Plaintiffs have stolen the intellectual property of others."

Each of the statements attributed to Deeter by Plaintiffs as constituting a breach of the severance agreement (regardless of whether Plaintiffs' attribution is accurate), was made in the course of judicial proceedings, was pertinent to the case, and therefore absolutely privileged.

The litigation privilege is also applicable to breach of contract actions. In *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 378 (7th Cir. 2010), the court observed, "No Indiana court has addressed whether the absolute privilege precludes not only tort liability, but also contractual liability." The Seventh Circuit took it upon itself to anticipate what Indiana courts would do. The *Rain* court noted, "Courts in a number of other jurisdictions have concluded that the absolute litigation privilege is applicable to breach of contract actions, at least where immunity from liability is consistent with the purpose of the privilege. The application of the privilege here allows Rolls-Royce to pursue its claims against third parties without fear of future legal liability arising out of its efforts to protect its intellectual property rights. By contrast, the failure to apply the privilege would frustrate the underlying policy by discouraging Rolls-Royce from exercising its fundamental right to resort to the courts to protect its rights." *Id*.

It is clear from the face of the Complaint that the statements attributed to Deeter are in reference to litigation and are privileged. The *Rain v. Rolls-Royce* case makes it additionally clear that the absolute privilege precludes, breach of contract claims, such as Count III, as well.

Count III should be dismissed pursuant to Rule 12(b)(6).

**D.     Count IV of the Complaint for Defamation *Per Se* Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).**

Plaintiffs' claim for defamation *per se* should also be dismissed for failure to state a claim upon which relief can be granted. "A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Columbus Specialty Surgery Ctr. v. Southeastern Ind. Health Org.*, 22 N.E.3d 665 (Ind. 2014) citing *Newman v. Jewish Cmty. Ctr. Assn. of Indpls.*, 875 N.E.2d 729, 739 (Ind. Ct. App. 2007). "[A] plaintiff who sues for defamation must set out the

alleged defamatory statement in the complaint." *Haegert v. McMullan,* 953 N.E.2d 1223, 1230

(Ind. Ct. App. 2011). The Indiana Supreme Court has held that

> even under notice pleading, a plaintiff must still set out the operative facts of the
> claim. Indeed, hornbook law stresses the necessity of including the alleged
> defamatory statement in the complaint. [citations omitted]. There is sound reason
> for this policy, as the absence of a statement in the complaint works a detriment on
> both the court and the defendant. The court is handicapped without the statement
> since, without it, the court cannot actually determine if the statement is legally
> defamatory. [citation omitted]. The defendant is placed on an unfair footing since
> the absence of the statement denies her the opportunity to prepare appropriate
> defenses.... Permitting defamation actions to proceed without the inclusion of the
> alleged statement would sanction claims brought by individuals who allege nothing
> more than that someone must have said something defamatory about them....

*Trail v. Boys and Girls Clubs of Nw. Ind*., 845 N.E.2d 130, 136-38 (Ind. 2006).

"[F]or a statement to be actionable, it must be clear that it contains objectively verifiable

fact regarding the Plaintiff. If the speaker is merely expressing his subjective view, interpretation,

or theory, then the statement is not actionable." *Meyer v. Beta Tau House Corp.,* 31 N.E.3d 501,

515 (Ind. Ct. App. 2015) (citation omitted). "The determination of whether a communication is

defamatory is a question of law for the court." *Ali v. Alliance Home Health Care, LLC*, 53 N.E.3d

420, 428 (Ind. Ct. App. 2016).

Count IV of the Complaint alleges as follows:

Paragraph 95 alleges: "Deeter and other employees of WishBone have made false

statements wrongly stating that Plaintiffs have stolen the intellectual property of others, causing

injury to an inventor."

Response: Paragraph 95 does not include the alleged defamatory statement; however, in

paragraph 54 of the Complaint, Plaintiffs present a screenshot from LinkedIn that Plaintiffs

erroneously assert includes a "disparaging comment" by Deeter that "OP *stole* something which

is demonstrably untrue." A clear reading of the screenshot shows Deeter made no such statement

and made no statement that falls within the definition of defamation *per se*. The statement

regarding something being stolen is by Tamer Isin, not Deeter. Plaintiffs have failed to include the necessary defamatory statement attributable to Deeter in the Complaint. See, *Trail v. Boys and Girls Clubs of Nw. Ind.*, *supra*.

In paragraph 55 of the Complaint, Plaintiffs allege that other WishBone employees "made disparaging comments about OP." In an effort to support that allegation, Plaintiffs again present a screenshot from LinkedIn that Plaintiffs erroneously assert includes a "disparaging comment" – which is actually an analogy - by Mary Wetzel, WishBone's President and COO. The LinkedIn screenshot at paragraph 56 purportedly contains Ms. Wetzel's statement: "Wow. Crazy what they did to that poor inventor trying to make a living. It reminds me of Robert Kearns who invented intermittent wipers and unfortunately, the big car companies stole it. He finally won $millions in the end." Ms. Wetzel did not falsely state that Plaintiffs stole anything. Consequently, Plaintiffs failed to include the necessary defamatory statement attributable to a WishBone employee in the Complaint. See, *Trail v. Boys and Girls Clubs of Nw. Ind.*, *supra*.

Moreover, immediately below, and part of the referenced screenshot in paragraph 56, is the image of a judicial gavel and the caption: "IMED Surgical Files Federal Lawsuit Against Orthex, Dror Paley, OrthoPediatrics, and Squadron Capital." Clearly, the LinkedIn statement by Mary Wetzel was a comment on the S.D. Fla. Action. Together, the statements of Deeter and Ms. Wetzel, even if they were actionable on their own, fall within the litigation privilege and are not actionable.

Paragraph 96 alleges: Deeter's and other WishBone employees' false statements that Plaintiffs have stolen from others and caused injury to an inventor have caused harm to Plaintiffs' reputations such that they lower Plaintiffs in the eyes of the community and/or deter third persons from associating with Plaintiffs.

Response: Plaintiffs failed to include defamatory statements in the Complaint, which even if such statements were defamatory – which they are not – the statements are not actionable for defamation *per se* because they fall within the litigation privilege.

Count IV should be dismissed pursuant to Rule 12(b)(6).

### E.     Count V of the Complaint for Tortious Interference with Contractual Relationships Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).

To state a claim for tortious interference with contract, a plaintiff must allege 1) the existence of a valid and enforceable contract, 2) the defendant's knowledge of the existence of the contract, 3) the defendant's intentional inducement of breach of the contract, 4) the absence of justification, and 5) damages resulting from the defendant's wrongful inducement of the breach. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994), *aff'd* 619 N.E.2d 597 (Ind. Ct. App. 1993); *Melton v. Ousley,* 925 N.E.2d 430, 440 (Ind. Ct. App. 2010).  Plaintiffs must in their factual allegations address not only how the defendant interfered with a contract, but *why* the defendant did so. See *Mourning v. Allison Transmission,* 72 N.E.3d 482, 488-89 (Ind. Ct. App. 2017). A plaintiff must state more than a mere assertion that the defendant's conduct was unjustified.  *See HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 677 (Ill. 1989) (noting that "[t]o properly state a cause of action for intentional interference with contractual rights, a plaintiff must state more than a mere assertion that the defendant's conduct was unjustified"; rather "the plaintiff must set forth factual allegations from which it can reasonably be inferred that the defendant's conduct was unjustified").  "To satisfy [the element of lack of justification], the breach must be malicious and exclusively directed to the injury and damage of another." *Winkler v. V. G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600-01 (Ind. Ct. App. 1993) (citations omitted), *aff'd*, 638 N.E.2d 1228 (1994); *see also Flintridge Station Ass'n v. American Fletcher Mortgage Co.*, 761 F.2d 434, 441 (7th Cir. 1985) (defining unjustified as

"disinterested malevolence"; "a malicious [conduct] unmixed with any other and exclusively directed to injury and damage of another"); *Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553, 562 (S.D. Ind. 1988).  Moreover, the existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability.  *Winkler*, 619 N.E.2d at 600-01.

 Count V alleges that Defendants tortiously interfered with Plaintiffs' existing contracts with its licensees, yet nowhere in the Complaint do Plaintiffs identify what contracts they allegedly have, with whom, which contracts were interfered with, how any statements of defendants would have interfered. Instead, Plaintiffs rely on the conclusory allegations that Plaintiffs "have valid and existing contracts with its (sic) licensees" [Dkt. 1, ¶ 99] and that "[u]pon information and belief, Defendants knew of these contractual relations." [Dkt. 1, ¶ 100]. Moreover, rather than plead specific knowledge of contractual interference, Plaintiffs, again engage in conclusory pleading by alleging "[u]pon information and belief, Defendants have contacted Plaintiffs' licensees and made false, misleading, and/or deceptive statements to Plaintiffs' licensees…"  As stated in *DBS Constr., Inc. v. New Equip. Leasing, Inc.*, 2011 U.S. Dist. LEXIS 32681 (N.D. Ind., Hammond Div. March 28, 2011), a plaintiff must prove that defendant "had knowledge of the contract at the time of the allegedly tortious conduct. *Tenta v. Guraly*, 221 N.E.2d 577, 580 (Ind. Ct. App. 1966). Importantly, this must be actual knowledge — objective standards like implied knowledge or constructive knowledge are insufficient. *Id*. See also *Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp.*, 759 N.E.2d 239, 251-252 (Ind. Ct.App. 2001) (summary judgment granted to Defendant for tortious interference with contract in part because Defendant had no knowledge of the contract at issue)." *DBS Constr., Inc.* [*11].

 Plaintiffs fail to allege that any of their licensees actually breached its contract with

Plaintiffs. Plaintiffs only allege that Defendants contacted their licensees, not that there was a resulting breach causing damages to Plaintiffs. The conclusory allegations of Count V do not meet the pleading standards of *Twombly* or *Iqbal*, *supra*. (allege enough facts to state a claim to relief that is plausible on its face or assert mere conclusory allegations).

Count V should be dismissed pursuant to Rule 12(b)(6).

**F.      Count VI of the Complaint for Tortious Interference with Prospective Contractual Relationships Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).**

The elements of tortious interference with a prospective business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Rice v. Hulsey*, 829 N.E.2d 87, 91 (Ind. 2005). Additionally, the Indiana Supreme Court has held that "this tort requires some independent illegal action." *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003), cert. denied, 541 U.S. 902, 124 S. Ct. 1602 (2004).

Plaintiffs' allegations in Count VI closely mirror those of Count V, even to the extent of alleging the existence of contracts and alleging that the purpose of Defendants' conduct was to induce the breach of Plaintiffs' contracts with their licensees, which elements are not a part of a tortious interference with prospective contractual relationship claim.

Plaintiffs baldly characterize Defendants' actions as "illegal" in paragraph 109 of the Complaint, but do not cite to any specific conduct as illegal, or to the violation of any statute that would constitute illegal conduct in order to satisfy the pleading requirements of a tortious interference with a prospective business relationship claim.

Each of the claims asserted in Counts V and VI contains the element "the absence of justification." While Defendants deny engaging in the wrongful conduct alleged in Counts V and

VI, even if such conduct were to be proven true, Defendants are entitled to assert the defense of justification. The Indiana Supreme Court analyzed the element of justification in *Harvest Life Ins. Co. v. Getche,* 701 N.E.2d 871, 877 (Ind. Ct. App. 1998), reh'g denied, trans. denied, and held:

> On the issue of justification when it concerns competitors in business we have turned to the Restatement (Second) of Torts § 768 (1977) for assistance. This section provides as follows:
>
> § 768 Competition as Proper or Improper Interference
>
> (1)     One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> > (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> > (b) the actor does not employ wrongful means and
>
> > (c) his action does not create or continue an unlawful restraint on trade and
>
> > (d) his purpose is at least in part to advance his interest in competing with the other.
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.
>
> Restatement (Second) of Torts § 768 (1977).
>
> The commentary to Restatement (Second) § 768 (1977) explains as follows:
>
> One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services. The only limitations upon this are those stated in Clauses (a) to (d).

*Harvest Life Ins. Co.* at 877.

Plaintiffs failed to plead any facts showing that Defendants' actions resulted in any actual interference with Plaintiffs' business relationships. Similarly, Plaintiffs failed to plead any facts showing the illegality of Defendants' actions, or that Defendants' actions were without

justification. Plaintiffs and WishBone are business competitors and the actions of Defendants as alleged by Plaintiffs demonstrates business competition, not tortious conduct, unless the statements referenced above constitute defamation *per se* which that is barred by the litigation privilege.

Count VI should be dismissed pursuant to Rule 12(b)(6).

## IV.  CONCLUSION

For each of the foregoing reasons, Counts I through VI of the Complaint should be dismissed.

Dated: December 16, 2020

Respectfully submitted,

/s/ Garrick T. Lankford
Garrick T. Lankford
glankford@bhlawyers.net
Michael D. Marston
mmarston@bhlawyers.net
**BOTKIN & HALL, LLP**
1003 N. Hickory Road
South Bend, IN 46615
Phone: (574) 234-3900
Facsimile: (574) 236-2839

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system on December 16, 2020, which will send notification of such filing to all parties of record.

/s/ Garrick T. Lankford
Garrick T. Lankford
glankford@bhlawyers.net
Michael D. Marston
mmarston@bhlawyers.net
**BOTKIN & HALL, LLP**
1003 N. Hickory Road
South Bend, IN 46615
Phone: (574) 234-3900
Facsimile: (574) 236-2839