**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION**

| | |
|---|---|
| ORTHOPEDIATRICS CORP., ORTHEX, LLC, and VILEX LLC, | |
| Plaintiffs | Case No. 3:20-cv-00929 |
| v. | |
| WISHBONE MEDICAL, INC. and NICK A. DEETER, | |
| Defendants. | |

**<u>FIRST AMENDED COMPLAINT</u>**

Plaintiffs, OrthoPediatrics Corp. ("OP"), Orthex, LLC ("Orthex") (collectively, "Orthopediatrics" or the "Orthopediatrics Plaintiffs"), and Vilex LLC ("Vilex") (collectively with Orthopediatrics, "Plaintiffs"), by and through their undersigned counsel, for their First Amended Complaint against Defendants WishBone Medical, Inc. ("WishBone") and Nick Deeter ("Deeter") (collectively, "Defendants"), allege as follows:

**<u>INTRODUCTION</u>**

1.     This case is about Orthopediatrics' game-changing innovation in orthopedic surgery, particularly a patented method of fixing broken or deformed bones with much greater accuracy and efficiency than ever before. WishBone has copied the patented technology, and its employees - including Deeter, a disgruntled former employee of one of the Plaintiffs - has tried to

compensate for WishBone's lack of innovativeness by publicly, and falsely, maligning Orthopediatrics.

2.     The inventors of the patent in issue, U.S. Patent No. 10,258,377 (the "'377 Patent") are two of the most prestigious and renowned innovators in the field of orthopedics: Dr. Dror Paley and Dr. Abraham Lavi. Dr. Paley, an orthopedic surgeon and the founder and director of the Paley Orthopedic and Spine Institute, has dedicated *decades* of his life to the advancement of orthopedics, particularly pediatric orthopedics. About 34 years ago, Dr. Paley brought to the United States the Ilizarov method of using external fixation to treat complex and/or open bone fractures. Since then, he has performed more than 20,000 limb lengthening and reconstruction-related procedures. He has published over 100 articles in peer-reviewed literature, and he has authored and edited five books and 45 book chapters, including Principles of Deformity Correction, a leading treatise on understanding and treating limb deformities. Patients come to the Paley Orthopedic and Spine Institute from all over the world because he is recognized as a leading surgeon and innovator.

3.     Dr. Lavi is a former Professor of Electrical Engineering at Carnegie Mellon University. He founded Vilex in Tennessee, Inc., which was a manufacturer of precision engineered extremity solutions for orthopedic surgery that specialized in internal and external fixation devices for foot and ankle, pediatrics, deformity correction, and reconstructive surgery, and sold those products in the United States and many international markets.

4.     Dr. Paley and Dr. Lavi designed the '377 Patent, which dramatically simplifies deformity correction planning and renders it significantly more accurate than pre-existing methods. More specifically, and as discussed in more detail later in this Complaint, the patented

method improves and automates bone adjustment, reduces guesswork, eliminates reliance on the patient, is more accurate than prior techniques, and simplifies external fixation.

5.      Orthex, a wholly owned subsidiary of OP, is the assignee of the '377 Patent.  OP is a leader in pediatric orthopedics. Through its work, OP has helped to set the standard of pediatric care in the field of orthopedics by developing products that meet the unique needs of pediatric patients. It is a leading supporter of pediatric orthopedic societies and clinical education in pediatric orthopedics. OP has a worldwide distribution reach and extraordinary brand equity with pediatric orthopedic surgeons. Vilex, an orthopedic medical device company, is an exclusive licensee of the '377 Patent.

6.      Deeter was an employee of OP from 2006 to 2013. During his time working for OP, Deeter learned about orthopedic pediatrics and OP's business operations. Deeter left OP and started WishBone in 2016, taking with him the knowledge and experience of pediatric orthopedics he gained from OP.

7.      WishBone recently announced that it received "510(k) clearance" from the United States Food and Drug Administration ("FDA") for its "Smart Correction® External Fixation System," discussed in further detail below. Though WishBone claims its software is "proprietary," a search on the United States Patent and Trademark Office's website for any patents assigned to WishBone turns up no results.

8.      As discussed in greater detail and specificity below, WishBone's Smart Correction® External Fixation System infringes the '377 Patent. What is more appalling is that Wishbone's infringement is knowing and intentional.  WishBone admittedly knew of the '377 Patent by no later than June of 2019, but proceeded to move forward with its infringing, copycat

system.  WishBone's manufacture, use, sale, offer to sell, or importation of the Smart Correction®
External Fixation System is ongoing or at least imminent.

9.      When Deeter left OP, the parties reached a severance agreement, in which Deeter
agreed not to disparage OP. Deeter has breached that obligation. Indeed, Deeter's social media
comments and other actions indicate that he is a disgruntled former employee envious of OP's
position in the industry and its continuing success story, as discussed in more detail and specificity
later. Deeter and Wishbone's other employees regularly attack and disparage OP and its employees
in the public.  Furthermore, WishBone's and/or Deeter's disparaging comments and other actions,
described in greater specificity below, violate the Lanham Act; breach the non-disparagement
clause in Deeter's severance agreement; are defamatory *per se*; and tortiously interfere with
Plaintiffs' current and prospective contractual and business relationships.

10.      In sum, Plaintiffs are innovators in the field and the patent-at-issue is
groundbreaking. Defendants cannot compete fairly, so instead they have resorted to intentionally
infringing Plaintiffs' patent and disparaging Plaintiffs publicly. Defendants' conduct has caused
great damage to Plaintiffs, thereby necessitating this lawsuit.

## NATURE OF THE ACTION

11.      This is an action under (1) the patent laws of the United States, 35 U.S.C. §§ 1 *et
seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* for patent infringement by
WishBone of U.S. Patent No. 10,258,377 (the "'377 Patent"); (2) the Lanham Act, 15 U.S.C. §§
1051, *et seq.,* for unfair competition and false advertising and (3) the common law for the State of

Indiana for breach of contract, defamation *per se*, tortious interference with contractual relationships, and tortious interference with business relationships.

## THE PARTIES

12.     Plaintiff OP is a Delaware corporation with a principal place of business at 2850 Frontier Drive, Warsaw, Indiana 46582.

13.     Plaintiff Orthex is a Florida limited liability company with a principal place of business at 4000 Hollywood Boulevard, Ste. 620-N Hollywood, Florida 33021. Orthex is a wholly-owned subsidiary of OP.

14.     Plaintiff Vilex is a Delaware limited liability company with a principal place of business at 111 Moffitt Street, McMinnville, Tennessee 37110.

15.     Upon information and belief, Defendant WishBone is an Indiana corporation with a principal place of business at 100 Capital Drive, Warsaw, Indiana 46582.

16.     Defendant Nick Deeter is an individual and, upon information and belief, Chairman and Chief Executive Officer ("CEO") of WishBone.

17.     Upon information and belief, Mr. Deeter is domiciled in Kosciusko County, Indiana.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, over Plaintiffs' claims of patent infringement and Lanham Act violations. Jurisdiction is also based on the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 based on an actual and continuing controversy as detailed below.  This Court has jurisdiction under 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction over the state law claims as substantial and so related to the

claims arising under federal law that they form part of the same case and controversy under Article III of the United States Constitution.

19.      This Court may exercise jurisdiction over Defendants because WishBone has a principal place of business in Indiana, Deeter is a resident of Indiana, and a substantial part of the events giving rise to this action occurred within Indiana.

20.      Venue is proper in this district because WishBone maintains an office and employees in this district and WishBone has committed acts of infringement in this district. *See, e.g.*, WISHBONE MEDICAL, *Contact*, *available at* https://www.wishbonemedical.com/contact/ (last visited Dec. 30, 2020). Moreover, upon information and belief, WishBone, directly and/or through intermediaries, sells, distributes, makes, uses, imports, offers for sale, and/or advertises infringing products or services within this District, and has many customers within this District and the State of Indiana.

## FACTUAL ALLEGATIONS

### A.      The Parties

21.      OP was founded in 2006 to focus on the field of orthopedic implants for children. At that time, implantable orthopedic devices in adults were becoming the norm, but too often, adult implants were modified in the operating room so they could be used in children. OP asked why a more appropriate standard of pediatric care should not be available, too. The company's vision was to address the problem of off-label use of adult implants by building a different kind of orthopedic company: a company focused exclusively on pediatric orthopedics and committed to the cause of improving the lives of children with orthopedic conditions.

22.      A key premise at OP is that children are not simply miniature adults. Accordingly, all of its products are designed and developed to ensure they are anatomically appropriate for

pediatric patients. In addition to OP's own engineering team, OP has a track record of collaborating with engineers and other industry experts around the world. OP has also assembled a board of eminent pediatric orthopedic surgeons to assist in developing products that meet the unique needs of pediatric patients. These factors have made OP the innovation leader in pediatric orthopedics.

23.     OP has developed and received regulatory clearance for 35 surgical systems for trauma, long bone deformity and correction, scoliosis, and sports medicine.  In the hands of skilled surgeons, OP's products can relieve the pain of children who are confined to a wheelchair, while enabling others to walk for the first time. OP's global sales organization is focused exclusively on pediatric orthopedics and distributes its products in the United States and more than 40 countries outside the United States.

24.     Vilex is a manufacturer of precision-engineered extremity solutions for orthopedic surgery. Vilex's mission is to provide innovative medical devices and cost-effective solutions to hospitals, surgery centers, and surgeons in the orthopedic community.

25.     Upon information and belief, WishBone is a pediatric orthopedic company with operations in Istanbul and Singapore as well as Warsaw, Indiana.

26.     Upon information and belief, Deeter is the Chairman and CEO of WishBone.

27.      In his profile on WishBone's website, Deeter recognizes OP as *"the World leader in pediatric orthopedics*." *See* WISHBONE MEDICAL, Nick A. Deeter, *available at* https://www.wishbonemedical.com/portfolio-item/nick-deeter-2/ (emphasis added) (attached as Exhibit A). Deeter's profile on WishBone's website further acknowledges OP's innovative focus on helping children, stating that "OrthoPediatrics provides implants specifically designed for children, suffering from trauma, deformity, scoliosis and sports related injuries." *Id.*

28.     Despite Deeter's recognition of OP's accomplishments and focus on advancing the field of pediatric orthopedics for the benefit of children, WishBone, under Deeter's leadership, has repeatedly engaged in harmful conduct directed at OP.  Consequently, OP has had to seek prior judicial intervention against WishBone and another prior OP employee, Robert von Seggern.  *See OrthoPediatrics Corp. v. Robert von Seggern & WishBone Medical Inc.,* Whitley Superior Court, Cause No. 92D01-1705-PL-000150 (Orders of Feb. 2, 2020) ("Whitley Superior Court Action").

29.     In the Whitley Superior Court Action, OP was forced to file a motion for sanctions against WishBone due to its and Deeter's failure to comply with discovery rules. As the Hon. Douglas M. Fahl found in the Whitley Superior Court Action:

> The Court concludes that WishBone and von Seggern have deliberately attempted to avoid their obligations in discovery in order to conceal the degree to which they may have violated the Stipulated Injunction. This conclusion is supported by Deeter's admission that he only produced documents that he considered "relevant," and by the misstatements made by WishBone and von Seggern to counsel and in filings discussed above.
>
> . . .
>
> Deeter's November 8, 2017, email to Miller chastising Miller for complying with its discovery obligations encompasses the very type of misconduct this Court must sanction. Deeter told Miller that its compliance with judicially-mandated discovery was "not acceptable." Deeter also warned Miller, telling it to "[p]lease let me know what your reasoning was for this action and if that is your standard mode of business." Given Miller's then-existing business relationship with WishBone, the implicit threat to Miller was clear: do not give OrthoPediatrics information, or else we are through.
>
> . . .
>
> In short, Deeter's email demonstrates that WishBone attempted to impede the free-flowing discovery process, thus hindering fact-finding and OrthoPediatrics' ability to litigate its case.

A true and correct copy of Judge Fahl's Findings of Fact And Conclusions of Law Concerning OP's Motion For Sanctions Filed 12-21-18 and Motion For Sanctions For Spoliation Filed 2-5-19 is attached hereto as Exhibit B.

30.     Nevertheless, WishBone and Deeter continue to publicly depict OP in a false and negative light. On October 5, 2020, IMED Surgical LLC, which is owned in part by WishBone,

filed a lawsuit against, among others, OP, Orthex, and Dr. Paley, alleging that Dr. Paley breached his consulting agreement with IMED. *See IMED Surgical, LLC v. Orthex, LLC et al*, No. 1:20-cv-24065 (S.D. Fla., Oct. 5, 2020) ("S.D. Fla. Action"). Ten days later, on October 15, 2020, IMED was forced to voluntarily dismiss the action for lack of subject matter jurisdiction. *Id.*, Dkt. 13.

**B.    The Severance Agreement**

31.    Deeter was employed by OP from its founding in 2006 through 2013.

32.    On June 3, 2013, Deeter resigned from OP.

33.    In conjunction with his employment separation, OP and Deeter entered into a Severance Agreement and General Release ("Severance Agreement").  A true and correct copy of the Severance Agreement is attached hereto as Exhibit C.

34.    The Severance Agreement contains a non-disparagement clause. *See* Ex. C. In relevant part, it states:

> Deeter further acknowledges and agrees that he will not make any statement now, or anytime in the future, to representatives of any media or any other person or organization, which are disparaging of Employer, Employer's reputation, or the character or competence of any director, officer, executive, agent or company or entity, related or affiliated with Employer.

*Id*.

**C.    The Asserted Patent**

35.    The '377 Patent, titled "Point and click alignment method for orthopedic surgeons, and surgical and clinical accessories and devices," issued on April 16, 2019. A true and correct copy of the '377 Patent is attached hereto as Exhibit D.

36.    The '377 Patent is assigned to Orthex, which has the right to bring suit for patent infringement. The named inventors for the '377 Patent are Dr. Abraham Lavi and Dr. Dror Paley.

37.     This '377 Patent relates to external fixators used for orthopedic bone alignment and correction. A fixator is a mechanical device surgically attached to each of the two ends of a broken bone. For illustration purposes only, a picture of an external ring fixator shown in the '377 Patent is reproduced below:



38.     Unlike internal fixation devices such as screws, plates, and intramedullary nails, external fixators provide postoperative adjustability to position and reposition the bones. The external fixator has struts whose lengths can be shortened or lengthened to achieve the required positional alignment. The amount by which each strut is lengthened or shortened varies from case to case. External fixators enable gradual manipulation using frame adjustment in case of limb lengthening, trauma, or deformity correction.

39.     Prior to the '377 Patent, postoperative adjustment with external fixators, particularly external ring fixators, was a manual undertaking. Although a surgeon was generally guided by X-rays or other imaging showing the relative positions of the bones, the calculations of

the magnitude of linear translation and angular rotation to affect the adjustment were generally made by eye and experience. ('377 Patent at col.1, ll.28-35.)

40.     The invention claimed in the '377 Patent improves and automates bone adjustment based on X-ray or other imaging, reducing guesswork, eliminating reliance on the patient, and simplifying the manual calculations on the part of the orthopedic professional. (*Id.* at col.1, ll.35-44.)

41.     The invention claimed in the '377 Patent is a point-and-click method in which an orthopedic professional inscribes lines or points on a computer screen displaying an X-ray or other photographic image of a patient's bone and fixator rings. ( *Id.* at col.1, l.48 - col.2, l.39.) Prompted by the inscriptions, a drawing program extracts position data for the patient's bone and fixator rings to calculate corresponding three-dimensional coordinates. (*Id.*) The algorithm is then prompted to make calculations of fixator adjustment that achieve a desired surgical or postoperative positioning outcome. (*Id.*)

42.     The claims of the '377 Patent set forth a unique and specific method necessarily rooted in computer technology that results in a great improvement in efficiency, ease of use, and accuracy in orthopedic bone alignment and correction using an external fixator.

43.     The claims of the '377 Patent, both individually and as an ordered combination, contain several inventive concepts. For example, the claimed method involves the inventive concept of extracting and calculating, from an X-ray or other photographic image, Cartesian angles and other data of a patient's bone and fixator rings to calculate further angular and rotational data, that avoids distortion and makes precise calculations possible. As another example, the claimed method contains the inventive concept of extracting and calculating Cartesian angles and other data of a patient's bone and fixator rings from an X-ray or other photographic image while still

doing so with the ingenuity of an orthopedic professional's drawing on a screen to generate the needed position data.

44. Orthex is not subject to any marking requirements under 35 U.S.C. § 287 and/or has complied with any such requirements.

**D.    Wishbone's Patent Infringing System**

45. On information and belief, WishBone Medical, Inc. recently sought and obtained FDA clearance for its Smart Correction® External Fixation System ("the Accused System"). *See* WISHBONE MEDICAL, *FDA Clearance Granted to WishBone Medical's Pediatric External Fixation System*, *available at* https://www.wishbonemedical.com/2020/10/13/fda-clearance-granted-to-wishbone-medicals-pediatric-external-fixation-system/ (Oct. 13, 2020).

46. The FDA's September 18, 2020 letter to WishBone, a true and correct copy of which is attached as Exhibit E ("FDA Approval Letter"), states that the FDA received WishBone's "Section 510(k) premarket notification of intent to market" the Accused System. (FDA Approval Letter at Page 1). Further, the FDA Approval Letter states that WishBone "may … market the device [i.e., the Accused System]." *Id.* Upon information and belief, the FDA's approval of the Accused System permitted WishBone to immediately offer to sell or sell the Accused System within the United States.

47. WishBone markets and promotes the Accused System on its website, where it describes the Accused System as a "software based deformity correction and fracture reduction tool." *See* WishBone Medical, *Smart Correction® Computer Assisted Circular Hexapod Fixator*, *available at* https://www.wishbonemedical.com/product/smart-correction-hexapod-fixator/ (last visited Dec. 30, 2020).

48.     WishBone provides a brochure describing the Accused System ("Brochure") on its website via a link to a Response Ortho website. A true and correct copy of the Brochure is attached hereto as Exhibit F.

49.     WishBone also provides on its website an instructional or promotional video of the Accused System ("Video"). *Id.*

50.     Upon information and belief, the Accused System was developed by WishBone through its wholly owned subsidiary Response Ortho. *Id.* On information and belief, Response Ortho is a Turkish company with the following address: ITOSB, 10. Cadde, No:1, Tuzla, 34959, Istanbul, Turkey. On information and belief, WishBone acquired Response Ortho in November 2018. *See* WISHBONE MEDICAL, WishBone Medical, Inc. acquires Response Ortho, *available at* https://www.wishbonemedical.com/2018/11/28/wishbone-medical-inc-acquires-response-ortho/ (Nov. 28, 2018). On information and belief, Response Ortho is "a WishBone Medical company." *See* Response Ortho, *About Us*, *available at* https://www.responseortho.com/aboutus/ (last visited Dec. 30, 2020).

51.     On information and belief, WishBone is currently using, manufacturing, selling, and/or importing the Accused System in the United States, including in this District, or plans to do so imminently. On October 30, 2020, Orthex and OP sent a cease-and-desist letter to WishBone asking WishBone to stop the infringing activities (hereinafter, "C&D Letter"). WishBone did not respond to the C&D Letter.

52.     As set forth in Counts I and II, Paragraphs 71-102, the Accused System infringes the '377 Patent.

**E.      WishBone's and Deeter's Other Unlawful Behavior**

53.      Since leaving his role as the former CEO of OP, Deeter has made numerous false and disparaging public statements regarding OP.

54.      Upon information and belief, Deeter is on a quest to disparage Plaintiffs, their products, and the surgeons that rely on said products to better the lives of children.

55.      Deeter regularly uses social media, including Facebook and LinkedIn, to post false statements about Plaintiffs.

56.      For example, on January 4, 2019, Deeter posted on Facebook accusing OP of "bullying and using anti-competitive and cowardly tactics:



57.      In another January 4, 2019 post on Facebook, Deeter, Mary Wetzel, Chief Operations Officer ("COO"), Secretary and Treasurer of WishBone, and others repeatedly posted false and disparaging comments about OP, including: (i) that it was following people, videotaping them, going through their personal items and trash, and making false statements about people in an effort to "ruin people's lives"; (ii) that OP was scared of Wishbone, (iii) that OP had taken technology from Wishbone:



**Nick Deeter**
January 4, 2019 · 🌐

INKFREENEWS.COM

**Pediatric Ortho Company Says Its Engaged In A 'David And Goliath' Legal Battle**

👍😮 16                                    20 Comments

👍 Like          💬 Comment          ↪ Share

**Mary Wetzel**
It's a lot like what the church of Scientologist did to Leah
Marie Remini and others that left. They follow former
members, videotape them, go through their personal
items and trash, and make false statements to ruin
people's lives.



Like · Reply · 1y

**Kim Ridings**
**Mary Wetzel** still trying to figure out the difference.
They've done almost all of those things. .. to no
avail.

Like · Reply · 1y

Write a reply...

**Sue Marshall Bartley**
Sad

Like · Reply · 1y

**Nick Deeter**
Sue, Orthopediatrics is scared to death of WishBone. The
only way they can compete is to constantly harass us
with lawsuits. It is sad.

Like · Reply · 1y

**Scott Werstler**
To think Bob VonSeggern gave years of his life to that
company and then they try to paint him to be a
dishonest monster. Bob is the kindest, gentlest man I
have ever met, and one of the most honest. Anyone who
knows Bob can see through this garbage for what it
really is.

Like · Reply · 1y



**Mary Wetzel**
And they sued Red Star for all their documents
when they never did sterile packaging. You spent
thousands of dollars in consulting fees and turned
all that information over. Coincidence? - they
announced they were getting into sterile packaging
the day after they received all your information, I
think not.

Like · Reply · 1y 

**Nick Deeter**
Scott, I'm the Founder of OP and they are treating
me worse than Bobby. I feel bad for their
employees that are trapped working there. OP's
CEO said they just wanted to keep WishBone on a
"short leash" and keep us from launching
WishBone. This lawsuit has gone far beyond that
and almost destroyed Bobby's family.

Like · Reply · 1y 

17



**Charles Davenport**
I worked at a computer company in the mid-90s who dealt with a lawsuit like this. The plaintiff's intent was not to win, but to tie up key personnel so they could not run, nor grow, their business. His legal fees were allegedly covered by an insurance rider. The plaintiff was heard to say he was going to "tort (us) all the way to the poorhouse."

Like · Reply · 1y



**Nick Deeter**
Fortunately we get to see the Judge in a week and tell our side of the story. OP wasted the Mediator's time and just wanted WishBone to close our doors. What an incredible waste of time and money.

Like · Reply · 1y                                               1



**Shawna Davenport**
**Nick Deeter** — it is sad that OP has to drag Wishbone into the courts! There are several orthopedic companies in Warsaw that are in competition with each other! They are just making it personal for the former founder of OP and do not want you to succeed... **See More**

Like · Reply · 1y                                     2



**Nick Deeter**
We have already succeeded. The lawsuit is just to harass and slow us down.

Like · Reply · 1y                                     1



**Shawna Davenport**
Also for the previous employees who now work for other companies! People have to make a living!

Like · Reply · 1y                                                    👍 2

**Kim Ridings**
Honestly, I think most see right through them, as did investors, as will the judge. I think they've actually hurt themselves and gained supporters for us. No one likes a bully... Especially one that is trying to hamper progress to help kids all in the... See More

Like · Reply · 1y                                                    👍 1

**Nick Deeter**
Kim, you are right. I spent part of my snow day going through the volumes of motions Orthopediatrics' lawyer wrote. It was like watching CNN and trying to understand their crazy liberal narrative. There wasn't a single fact in the document that had anything to do with the case. I didn't get to the part yet that Bobby was cooperating with the Russians.

Like · Reply · 1y                                                    👍 4

**Jeanne Sands**
👏👏

Like · Reply · 1y



58.    Thereafter, on March 2, 2020, Deeter sent an email to Aaron Korngold stating, in relevant part, that he was attempting to "put considerable downward pressure on the KIDS public stock."  KIDS refers to OP's trading symbol on NASDAQ.

59.    Deeter also wrote in his March 2, 2020 email to Mr. Korngold that Deeter and WishBone "haven't spent much time on this lawsuit [Whitley Superior Court Action], but now that

we are well funded, we have hired new legal counsel to file numerous countersuits," which includes the now-voluntarily dismissed S.D. Fla. Action.

60.    Since sending Mr. Korngold his March 2020 email, Deeter and those acting in concert with him have continued publicly and falsely accusing OP of, among others things, "evil behavior," and further alleging that OP "stole" from a "poor inventor trying to make a living."

61.    Deeter regularly uses LinkedIn to post false statements about Plaintiffs.

62.    For example, in October 2020, Deeter posted the following disparaging comment on LinkedIn:





Thus, Deeter makes the false statement of fact that OP *stole* something, which is demonstrably untrue.

63. Wetzel also posted the following false statement about OP on LinkedIn in October 2020:



Like Deeter's statements in the aforementioned October 2020 LinkedIn post, Wetzel also states, as a matter of fact, that Plaintiffs *stole*. Again, this is patently false.

64. On December 2, 2020, Culper Research, an anonymous online website, published an unsubstantiated hit piece on OP ("Culper Report"). CULPER REPORT, *OrthoPediatrics Corp. (KIDS): Even Channel Stuffing Can't Save This Company*, available at https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-

a0b8d77f25ab/downloads/Culper_KIDS_12-2-2020.pdf?ver=1607951800073 (last visited Dec.

30, 2020). After the Culper Report was released, Deeter began promoting the article on social

media in order to promote, publicize and more widely distribute its false and misleading content:



65.     Deeter also posted on LinkedIn that he hopes the release of the Culper Report will

"expose KIDS" (*i.e.*, OP's Nasdaq trading symbol) and, in addition, help IMED with its lawsuit

against OP, to which Deeter is not a party:



The comments which Deeter posted on LinkedIn wrongfully disseminate false information and disparage OP by, for example, stating that it "abused" another entity, which is patently false.

66.     Defendants' conduct has irreparably harmed Plaintiffs by tarnishing their reputations.

67.     Nevertheless, in 2017, Deeter stated, "I founded both companies [OP and WishBone] and we are both dedicated to helping children with orthopedic issues. The business **models** used to achieve this wonderful cause of helping kids are dramatically different." *See* Orthopedics This Week, *New Pediatrics Orthopedic Company: WishBone Medical*, *available at* https://ryortho.com/breaking/new-pediatrics-orthopedic-company-wishbone-medical/   (Jan.   27, 2017) (last visited Dec. 31, 2020) (emphasis added).

68.     Similarly, in an interview with www.orthostreams.com, Deeter stated, "[M]y second start up in this space, OrthoPediatrics, which I left four years ago after investors had taken control, *is doing well*."  *See* OrthoStreams, *6 Questions with Nick Deeter, the undisputed pioneer of orthopedic implants for kids, available at* https://orthostreams.com/6-questions-with-nick-deeter-the-undisputed-pioneer-of-orthopedic-implants-for-kids/ (*last visited* Dec. 31, 2020) (emphasis added).

69.     Put simply, Deeter has publically applauded the work of OP, thus, to also claim that OP has stolen is both contradictory and false.

70.     Defendants' false statements have irreparably harmed Plaintiffs by tarnishing their reputations.

## COUNT I
## INFRINGEMENT OF THE '377 PATENT
### (*by Plaintiffs against Defendant WishBone*)

71.     Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 70.

72.     WishBone's manufacture, use, sale, offer for sale, and importation of the Accused System directly and/or indirectly infringes one or more Claims of the '377 Patent literally and/or under the doctrine of equivalents.

73.     Independent Claim 1 of the '377 Patent reads as follows:

> **1**. A point and click method to implement intended manipulation of an external fixator frame by an orthopedic professional, comprising the steps of:
> a) providing a computer, said computer having an input screen in association therewith wherein said input screen has a plurality of sensors associated therewith to detect and register a plurality of position data inscribed on said input screen;
> b) providing to said computer an algorithm which computes orientation data from said position data according to equations set forth in g) below;

c) taking at least two medical images of a patient to create two views, with each view's showing at least one bone with at least one external fixator, said external fixator comprising external fixator hardware having at least one ring and said ring's further forming a part of a six-axis external fixator device and further comprising fixator hardware, with said at least two views being oriented from different angles and displayed on said input screen;

d) marking by said orthopedic professional one or more points or one or more lines on said input screen to create said position data, with said position data's representing either or both of a position or positions of a bone, bones, bone segments, joint space, anatomic loci or osteotomy or one or more elements of said external fixator hardware;

e) extracting, using said algorithm, two or more sets of two dimensional coordinates corresponding to said points or lines on said images, calibrating said images, and thereby producing three-dimensional x, y and z coordinates for i) angular orientations of bone or bone segments; ii) angular orientations of said external fixator hardware, and iii) coordinates of a center of said ring; and

f) further calculating, via said algorithm, at least one pivot point as output to an orthopedic professional to depict as output to said orthopedic professional one or more adjustments to said angular orientations necessary to achieve an intended bone manipulation configuration, wherein said algorithm further comprises

g) defining orthogonal coordinates (x', y', z') for said fixator hardware, defining said coordinates as one of three translational displacements for each of three axes; assigning Euler angles in the following sequence

Rotate an angle • (yaw) around the z-axis

Rotate an angle • (pitch) around the y-axis

Rotate an angle • (roll) around the x-axis

wherein the coordinates $q_i$ with respect to a Base reference framework of an anchor point $p_i$ of a $i^{th}$ leg are given by the equation

$$q_i = T + R_B * p_i$$

where T is the translation vector, giving a positional linear displacement of the origin of the platform frame with respect to the Base reference framework, and $p_i$ is the vector defining the coordinates of the anchor point $P_i$ with respect to platform framework and, similarly, the length of the $i^{th}$ leg is given by

$$l_i = T + R_B * p_i - b_i$$

wherein a vector $b_i$ defines the coordinates of the lower anchor point B in order to set up 18 simultaneous non-linear equations as to six unknowns representing position and attitude of the platform by implementing a mathematical optimization algorithm to extract data

from said views to correlate a desired strut length with a desired geometric position for said fixator hardware.

74.     WishBone's Accused System provides "**[a] point and click method** to implement intended manipulation of an external fixator frame by an orthopedic professional," as claimed in the '377 Patent. (emphasis added). In the Brochure, WishBone describes the Accused System as a "software based deformity correction and fracture reduction platform," where the external fixator is a "frame [] comprised of rings, struts, wire and screw clamps, articular hinge, threaded rods and variety of wires and screws" used in combination with the Smart Correction® software, which "provides easy application, high mechanical stability and precise correction in all planes via unique web based software." (Brochure at 3.) WishBone's Accused System employs a "point and click method" at least because WishBone instructs that the user should "locate the chosen axis for each bone segment" for "Bone Segment Mapping" using a mouse as illustrated by the screenshot reproduced below:



(*Id.* at 22.)

75.    WishBone practices steps (a), (c), and (d) of Claim 1 of the '377 Patent. WishBone, by and through the Accused System, practices "providing a computer, said computer having an **input screen** in association therewith wherein said input screen has a plurality of sensors associated therewith to detect and register a plurality of position data inscribed on said input screen;" "**taking at least two medical images of a patient** to create two views, with each view's showing at least one bone with at least one external fixator, said external fixator comprising external fixator hardware having at least one ring and said ring's further forming a part of a six-axis external fixator device and further comprising fixator hardware, with said at least two views being oriented from different angles and displayed on said input screen;" and "**marking** by said orthopedic professional one or more points or one or more lines on said input screen to create said position data, with said position data's representing either or both of a position or positions of a bone, bones, bone segments, joint space, anatomic loci or osteotomy or one or more elements of

said external fixator hardware," as claimed. (emphasis added). First, with respect to step (c) of Claim 1, WishBone provides the Accused System, and instructs that "[i]n order to undertake the correction using the web based software ***it is necessary to obtain two radiographic images (one in the A/P plane and one in the M/L)*** and to record the position of the frame during the imaging," as further shown by the below screenshot. (Brochure at 16.) (emphasis added) WishBone thus requires "taking at least two medical images of a patient to create two views" during the use of the Accused System. Furthermore, as evidenced by the relevant screenshots reproduced below from the Brochure and the Video, WishBone explains that each view shows "at least one bone with at least one external fixator" and that the two views are "oriented from different angles" and "displayed on [the] input screen."  As also evidenced by at least the screenshots reproduced below from the Brochure and the Video, the external fixator hardware has "at least one ring," which "further form[s] a part of a six-axis external fixator device":



(time point 2:50)

Thus, WishBone performs, or instructs to perform, step (c) of Claim 1. Second, with respect to claimed steps (a) and (d), the Accused System provides "virtual frame" models of the fixator strut

position and lengths. (*Id*. at 19-20.) In the "Data Entry" section of the Brochure, WishBone explains that the Accused System registers "the information recorded on the patient data form the size of the rings, and strut types" and "identif[ies] the position on each ring and length of each strut, as recorded on the patient data form." (*Id*. at 19.)  WishBone also states the following in the Brochure: "Note the system automatically places the struts into a default position based on the size of the ring used. It is important that the user amends these positions to represent the true frame that has [to] be constructed." (*Id*. at 20.) In the Brochure, WishBone instructs that the radiographs be uploaded and then used to adjust the orientation of each radiograph until it matches and overlays the gridline frame models. (*Id*. at 21.) In the "Deformity Parameter - Bone Segment Mapping" section of the Brochure, WishBone provides instructions detailing how the Accused System is used to "locate the chosen axis for each bone segment in both the frontal and lateral images." (*Id*. at 22.). Moreover, as evidenced by the screenshots reproduced below from the Brochure, WishBone performs, or instructs to perform, steps (a) and (d) of Claim 1:



For instance, WishBone instructs marking the input screen to create position data for a bone or bone segment on an equipped computer. Furthermore, as shown in the screenshots from the Video

below, WishBone describes the marking step for the creation of position data by showing how the

X-ray image and the X-ray template are overlaid and then the mid-diaphyseal axis is marked:



(time range 2:26 - 2:35)



(time range 2:36 - 2:49)

76.     WishBone performs steps (b), (e), and (g) of Claim 1 of the '377 Patent. WishBone,

by and through the Accused System, practices "providing to said computer an **algorithm** which

computes orientation data from said position data . . . " and "**extracting, using said algorithm,**

**two or more sets of two dimensional coordinates** corresponding to said points or lines on said

images, calibrating said images, and thereby **producing three-dimensional x, y and z**

**coordinates** for i) angular orientations of bone or bone segments; ii) angular orientations of said external fixator hardware, and iii) coordinates of a center of said ring." (emphasis added). WishBone states in the Brochure that the external fixator of the Accused System is used in combination with the Smart Correction® software, which "provides easy application, high mechanical stability and precise correction in all planes." (*Id.* at 3.) The software in the Accused System necessarily contains such an algorithm so that it can extract the "two dimensional coordinates" as discussed above and render the "three-dimensional x, y and z coordinates." This infringing functionality is depicted, for example, in the Video (relevant screenshot reproduced below):

 

(time point 2:50)     (time point 2:52)

On information and belief, WishBone, by and through the Accused System, practices step (g) of Claim 1 by using the equation provided therein or an equivalent thereof.

77.     Lastly, WishBone performs step (f) of Claim 1 of the '377 Patent. WishBone, by and through the Accused System, practices "further **calculating**, via said algorithm, at least one pivot point as output to an orthopedic professional to depict as output to said orthopedic professional one or more adjustments to said angular orientations necessary to achieve an intended bone manipulation configuration." (Emphasis added). WishBone informs in the Brochure that the Accused System "us[es] the [Smart Correction®] software to calculate the deformity correction."

(*Id.* at 16.). WishBone further informs in the Brochure that "Smart Correction . . . uses a copyrighted radiographic navigation program which calculates the schedule of frame adjustment in order to achieve the desired correction." (*Id.* at 17.) In the "Deformity Parameter - Bone Segment Mapping" section of the Brochure, WishBone states the following: "Note: the software will adjust the correction to bring the two fragment markers into line through compression or distraction. Should the marker not meet the system will compress, and should they overlap the system with distract." (*Id.* at 22.) The below screenshot from the Brochure illustrates the process:



(*Id.* at 23.) WishBone informs in the Brochure that the Accused System's software calculates the schedule of frame adjustment in order to achieve the desired correction. (*Id.* at 24.)

78.     On information and belief, WishBone uses the Accused System for multiple purposes including, without limitation, testing, demonstrations, marketing, advertising, product development and training.  WishBone also markets and/or sells the Accused System to third party

customers, including orthopedic professionals, and instructs such third party customers to use the Accused System, which directly infringes Claims 1-5 of the '377 Patent. As set forth above, WishBone provides instructions to such third parties on how to use the Accused system in a manner that infringes the claims of the '377 Patent. At least the Brochure and the Video describe how to use the infringing Accused System.

79.     Thus, WishBone directly infringes the claims of the '377 Patent because each step of the claims is either performed by or attributable to WishBone, as described in Paragraphs 45-52 and 72-78 above.

80.     WishBone also indirectly infringes the '377 Patent under 35 U.S.C. § 271(b) by actively and knowingly inducing third parties, including orthopedic professionals, to commit acts that constitute infringement of the '377 Patent, as described in Paragraphs 45-52 and 72-78. WishBone knows of, knew of, or was or has been willfully blind to its own infringement of the '377 Patent.

81.     WishBone had knowledge of the '377 Patent prior to the filing of this lawsuit.

82.     WishBone has been aware of the '377 Patent at least since June 2019. Tamer Isin, the CEO and Cofounder of IMED Surgical, LLC, learned of the '377 Patent at least as early as June 2019. (*See Imed Surgical, LLC v. Orthex, LLC et al*, No. 1:20-cv-24065 (ECF. No. 1, ¶ 38) (S.D. Fla., Oct. 5, 2020) (voluntarily dismissed). IMED is owned by WishBone ExFx. (*Id.* at ¶ 4). Upon information and belief, WishBone ExFx is owned and/or controlled by WishBone. Alternatively, WishBone ExFx's knowledge of the '377 Patent is imputed to WishBone at least because, on information and belief, Deeter, Chairman and CEO of WishBone, is also a member of WishBone ExFx. In accordance with Fed. R. Civ. P. 11(b)(3), Plaintiffs will likely have additional

evidentiary support after a reasonable opportunity for further investigation or discovery on this issue.

83.     WishBone was made aware that it infringes the '377 Patent at least no later than October 30, 2020 when OP and Orthex initiated this lawsuit and sent the C&D Letter to WishBone. On information and belief, Wishbone was aware that its Accused System infringes the '377 patent long before October 30, 2020, and prior to obtaining FDA clearance of the Accused System.

84.     Thus, as alleged above, WishBone actively, knowingly and intentionally aids, abets, directs, encourages, or otherwise instructs third parties via the sale, offer to sell, promotions, and advertising of the Accused System, and provision of instructions regarding using such Accused System in the manner described in the asserted claims of the '377 Patent, to infringe the '377 Patent by and through their use of the Accused System. Therefore, WishBone induces, has induced, and continues to induce, infringement of claims 1-5 of the '377 Patent in violation of the patent laws of the United States, and in particular 35 U.S.C. §§ 271, *et seq.*

85.     WishBone's conduct, as described herein, also constitutes contributory infringement of the '377 Patent under 35 U.S.C. § 271(c). WishBone has known that the Accused System was being made and distributed for the purpose of infringement of the '377 Patent by users or businesses. Moreover, the Accused System has no substantial non-infringing uses.

86.     WishBone's infringement of the '377 Patent is and has been willful.

87.     On information and belief: (i) WishBone cannot reasonably believe that its actions do not constitute infringement of the '377 Patent and/or are not highly likely to constitute infringement of the '377 Patent, and/or (ii) WishBone knows or is willfully blind to the fact that its actions constitute infringement of the '377 Patent and/or are highly likely to constitute infringement of the '377 Patent. Nevertheless, WishBone persists with its infringing activities.

WishBone has not identified to Plaintiffs an opinion of counsel or any other investigation, design around, or remedial action with respect to the '377 Patent. Accordingly, WishBone has willfully infringed and/or will continue to willfully infringe one or more claims of the '377 Patent. In accordance with Fed. R. Civ. P. 11(b)(3), Plaintiffs will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery on this issue.

88.     As a result of WishBone's infringement of the '377 Patent, Plaintiffs have suffered and continue to suffer monetary damages, and seek recovery in an amount to compensate Plaintiffs for WishBone's infringement, in no event less than a reasonable royalty for WishBone's use of the patented invention, together with interest and costs as fixed by the Court.

89.     Pursuant to 35 U.S.C. § 284, enhanced damages of up to three times the amount found or assessed are therefore warranted against WishBone. WishBone's actions further make this an exceptional case supporting an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285.

90.     Plaintiffs have suffered and will continue to suffer irreparable harm in the future unless WishBone's infringing activities are enjoined by this Court.

**COUNT II**
**DECLARATORY JUDGMENT OF INFRINGEMENT OF THE '377 PATENT**
(***by Plaintiffs against Defendant WishBone***)

91.     Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 90.

92.     This declaratory judgment claim arises under the United States Patent Laws, 35 U.S.C. §§ 100 *et seq.*, including 35 U.S.C. § 271(a), (b), or (c), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

93.     There is an actual case or controversy such that the Court may entertain Plaintiffs' request for declaratory relief consistent with Article III of the United States Constitution, and that actual case or controversy requires a declaration of rights by this Court.

94.     Upon information and belief, the FDA's approval of WishBone's Accused System coupled with WishBone's commercial activities in support of importation and launch of the Accused System, including (i) WishBone's application to the FDA for permission to market the Accused System, (ii) WishBone's announcement of the FDA's approval, (iii) WishBone's advertising of and making available the Accused System on its website, (iv) WishBone's provision of the instructions pertaining to the use of Accused System such as those provided in Brochure and Video, and (v) WishBone's decision not to respond to the C&D Letter, create an actual, immediate, and real controversy under the Declaratory Judgment Act that WishBone will directly infringe, actively induce, and/or contribute to the infringement of valid and enforceable claims of the '377 Patent before its expiration in violation of 35 U.S.C. § 271(a), (b), and (c), as alleged in Paragraphs 45-52 and 73-89 incorporated by reference herein.

95.     WishBone's manufacture, use, sale, offer for sale, and importation of the Accused System directly and/or indirectly infringes one or more Claims of the '377 Patent literally and/or under the doctrine of equivalents, as alleged in Paragraphs 45-52 and 72-78 above incorporated by reference herein. Furthermore, WishBone's infringement is and has been willful, as alleged in Paragraphs 86-87 incorporated by reference herein. WishBone's infringement has caused significant damages to Plaintiffs, as alleged in Paragraphs 88-90 incorporated by reference herein.

96.     Upon information and belief, WishBone is currently manufacturing and/or imminently will manufacture and supply the Accused System, and WishBone is marketing the

Accused System, intends to market the Accused System and will market the Accused System, within this District and elsewhere in the United States.

97.     Upon information and belief, WishBone and/or a third party acting in concert with WishBone are importing and/or imminently will import the Accused System in the United States.

98.     Upon information and belief, WishBone has engaged in and will continue to engage in substantial activities in preparation to market the Accused System in the United States.

99.     A judicial declaration of infringement is necessary and appropriate to resolve this controversy.

100.    Plaintiffs will be substantially and irreparably harmed if WishBone is not enjoined from infringing the '377 Patent.

101.    Plaintiffs have no adequate remedy at law.

102.    This case is exceptional, and Plaintiffs are entitled to an award of attorney fees under 35 U.S.C. § 285.

## COUNT III
## UNFAIR COMPETITION AND FALSE ADVERTISING
### *(by Orthopediatrics Plaintiffs against Defendants WishBone and Deeter)*

103.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 102.

104.    Deeter and other WishBone employees have made false statements wrongly accusing Orthopediatrics of committing theft and improperly causing harm to an inventor on, at a minimum, Facebook and LinkedIn.

105.    In sum, Defendants have made false representations both on social media that Orthopediatrics' products were created, designed, and authorized by someone other than Plaintiffs.

39

106.    As Deeter has admitted in his March 2, 2020 email to Mr. Korngold, his goal with litigation is to negatively affect Orthopediatrics' market share.  Therefore, Defendants' actions have been deliberate, willful, and malicious.

107.    Defendants' statements on social media and to a court are both public and thus Defendants caused and directed their false or misleading statements to enter interstate commerce.

108.     Defendants' statements also are material as they relate to customers' purchasing decisions.

109.    As a direct consequence of Defendants' false misrepresentations, Orthopediatrics has been harmed.

**COUNT IV**
**BREAK OF CONTRACT**
***(by Plaintiff OP against Defendant Deeter)***

110.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 109.

111.    The Severance Agreement is an enforceable contract.

112.    OP has fully performed the terms of the Severance Agreement.

113.    As aforementioned, the Severance Agreement contains the following Confidentiality and Non-Disparagement Provision:

> Deeter further acknowledges and agrees that he will not make any statement now, or anytime in the future, to representatives of any media or any other person or organization, which are disparaging of Employer, Employer's reputation, or the character or competence of any director, officer, executive, agent or company or entity, related or affiliated with Employer.

*See* Ex. C.

114.    Deeter has breached the Severance Agreement by making disparaging false statements and comments about OP and OP's reputation to third parties, including but not limited to stating that Plaintiffs have stolen the intellectual property of others.

115.    Deeter's breach of the Severance Agreement has caused damage to OP in an amount to be determined at trial.

## COUNT V
## DEFAMATION *PER SE*
### *(by Orthopediatrics Plaintiffs against Defendants WishBone and Deeter)*

116.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 115.

117.    Deeter and other employees of WishBone have made false statements wrongly stating that Orthopediatrics has stolen the intellectual property of others, causing injury to an inventor.

118.    Deeter's and other WishBone employees' false statements that Orthopediatrics has stolen from others and caused injury to an inventor have caused harm to Orthopediatrics' reputations such that they lower Orthopediatrics in the eyes of the community and/or deter third persons from associating with Orthopediatrics.

119.    As a direct and proximate result of Defendants' false statements, Orthopediatrics' business reputation as well as the reputation of their products have been diminished, thereby causing monetary damages to Orthopediatrics in an amount to be determined at trial.

## COUNT VI
## TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONSHIPS
*(by Orthopediatrics Plaintiffs against Defendants WishBone and Deeter)*

120.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 119.

121.    Orthopediatrics has valid and existing contracts with its licensee customers.

122.    Upon information and belief, Defendants knew of these contractual relations as Deeter was a former executive of OP.

123.    Upon information and belief, Defendants have contacted Orthopediatrics' licensee customers and made false, misleading, and/or deceptive statements to Orthopediatrics' licensee customers to further Defendants' own business opportunities, promote the sale of its products, and induce Orthopediatrics' licensee customers to breach their contracts with Orthopediatrics.

124.    Such interference was without justification and has caused Orthopediatrics damage.

125.    Defendants' actions are harmful, willful, wanton, and undertaken with callous disregard to Orthopediatrics' interests and contractual relationships.

126.    As a result of Defendants' tortious interference with Orthopediatrics' contractual relationships, Orthopediatrics respectfully requests that this Court enter judgment against Defendants in an amount to be proven at trial, together with punitive damages, pre-judgment, and post-judgment interest at the highest legal rate, the costs of this action, and all other relief as this Court deems just and proper.

## COUNT VII
## TORTIOUS INTERFERENCE WITH
## PROSPECTIVE CONTRACTUAL RELATIONSHIPS
### *(by Orthopediatrics Plaintiffs against Defendants WishBone and Deeter)*

127.    Plaintiffs re-allege and incorporate by reference the allegations set forth in Paragraphs 1 through 126.

128.    Orthopediatrics has business relationships with its prospective licensee customers.

129.    Upon information and belief, Defendants knew of these business relations as Deeter was a former executive of OP.

130.    Upon information and belief, Defendants have contacted Orthopediatrics' licensee customers and made false, misleading, and/or deceptive statements to Orthopediatrics' licensees to further Defendants' own business opportunities, promote the sale of its products, and induce Orthopediatrics' licensees to breach their contracts with Orthopediatrics.

131.    Defendants' conduct in interfering with Orthopediatrics' business relationships was illegal since it utilized actions prohibited by federal statutes and Indiana law.

132.    Defendants' actions were harmful, willful, wanton and undertaken with a callous disregard to Orthopediatrics' interests and business relationships. Punitive damages in this action against Defendants are appropriate to deter such conduct in the future and to serve the public good.

133.    As a result of Defendants' tortious interference with Orthopediatrics' business relationships, Orthopediatrics respectfully requests that this Court enter judgment against Defendants in such an amount to be proven at trial, together with punitive damages, pre-judgment and post-judgment interest at the highest legal rate, the costs of this action, and all other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

A.      That the Court enter judgment that the '377 Patent is enforceable and infringed by WishBone, literally and/or under the doctrine of equivalents, and that WishBone's infringement is and has been willful.

B.      That the Court enter judgment that WishBone has engaged in induced infringement of one or more claims of the '377 Patent.

C.      That the Court enter judgment that WishBone has engaged in contributory infringement of one or more claims of the '377 Patent.

D.      That the Court declare that WishBone's manufacture, use, sale, offer to sell, and/or importation of the Accused System will constitute direct infringement of the '377 Patent.

E.      That the Court declare that WishBone's manufacture, use, sale, offer to sell, and/or importation of the Accused System will constitute indirect infringement of the '377 Patent.

F.      That the Court enter a judgment and order against WishBone and awarding to Plaintiffs all damages adequate to compensate Plaintiffs for WishBone's direct or indirect infringement of the '377 Patent, together with interests, costs and disbursements, and treble damages pursuant to 35 U.S.C. § 284.

G.      That the Court enter a judgment and order requiring WishBone to provide accountings and to pay additional and/or supplemental damages to Plaintiffs, including without limitation: (i) with respect to any sales or revenues not presented at trial, (ii) post-judgment reasonable royalty damages, (iii) prejudgment interest, and (iv) post-judgment interest.

H.       That the Court enter a permanent injunction to prevent WishBone and its subsidiaries, parents, divisions, directors, officers, agents, servants, employees and all other persons in active concert or privity or in participation with them, from making, using, selling, offering for sale, importing or distributing, or inducing others to make, use, sell, offer for sale, import or distribute, the Accused System and any other product or service that infringes the '377 Patent.

I.       That the Court enter a judgment that this case is exceptional, and to award Plaintiffs all of its costs, expenses, and reasonable attorneys' fees under 35 U.S.C. § 285 and all other applicable statues and rules in common law that would be appropriate;

J.       That Defendants be adjudged to have committed false advertising in violation of 15 U.S.C. § 1125(a);

K.       An award of monetary damages against Defendants for damages caused by their false, misleading, deceptive, and/or tortious acts;

L.       An award of monetary damages against Defendants in the amount of Defendants' profits gleaned from its false, misleading, and or tortious acts, pursuant to 15 U.S.C. § 1117;

M.       An award of Plaintiffs' costs and attorneys' fees pursuant to 15 U.S.C. § 1117; and

N.       That Plaintiffs be awarded such other and further relief as this Court may deem just and proper under the circumstances.

Date: January 6, 2021

                                        DENTONS US LLP


                                        */s/ Timothy J. Carroll*
                                        _____

                                        Timothy J. Carroll (admitted *pro hac vice*)
                                        Jaimin H. Shah (admitted *pro hac vice* )
                                        233 South Wacker Drive, Suite 5900
                                        Chicago, IL 60606

Telephone: (312) 876-8000
Fax: (312) 876-7934
tim.carroll@dentons.com
jaimin.shah@dentons.com

Mary Kate Brennan (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone: (212) 768 6700
Fax: (212) 768-6800
marykate.brennan@dentons.com

Manny J. Caixeiro (admitted *pro hac vice*)
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Fax: (213) 623-9924
manny.caixeiro@dentons.com

DENTONS BINGHAM GREENEBAUM

Andrew W. Gruber
Alex E. Gude
Meaghan K. Haller
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204
Telephone: (317) 635 8900
Fax: (317) 236-9907
andrew.gruber@dentons.com
alex.gude@dentons.com
meaghan.haller@dentons.com

*Attorneys for Plaintiffs*