**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

ORTHOPEDIATRICS CORP., et al.,

        Plaintiffs,

        v.                         CASE NO. 3:20-CV-929-JD-MGG

WISHBONE MEDICAL, INC., et al.,

        Defendants.

**OPINION AND ORDER**

Ripe before the Court is Plaintiffs Orthex, LLC, Orthopediatrics Corp., and Vilex LLC ("Plaintiffs'") Motion to Compel Document Production from Defendants WishBone Medical, Inc. ("WishBone") and Nick A. Deeter (collectively "Defendants"), filed on December 2, 2022, in this patent infringement case. For the reasons discussed below, Plaintiffs' Motion to Compel is granted in part and denied in part.

## I.   FACTUAL BACKGROUND

Orthopedic professionals use devices called external fixators to treat patients suffering from broken bones or other bone abnormalities. An external fixator fits around an individual's limb and often has a certain number of struts that run into the limb and attach to the bone to ensure the bone is positioned for proper healing. In the past, orthopedic professionals had to rely on their own estimations and experience to determine exactly how to position the external fixator and accompanying struts on a limb. With the advent of new technology, patented on April 16, 2019, under patent

number 10,258,377 ("the '377 Patent" [1]), orthopedic professionals can now look at an X-ray, or other photographic image of a patient's bone, and the fixator apparatus on a computer screen, use a mouse or other device to inscribe lines and points on the images as needed, and then generate calculations showing the optimal way to position the bones using the external fixator.

Plaintiff Orthex LLC, a wholly owned subsidiary of Plaintiff OrthoPediatrics Corp., is the assignee of the '377 Patent, and Plaintiff Vilex, a medical device company, is an exclusive licensee. Plaintiffs initiated this patent infringement case on October 30, 2020, alleging that WishBone is—or imminently will be—infringing the '377 Patent through the sale, use, and promotion of its Smart Correction External Fixation System ("Smart Correction" or "Accused System"). According to Plaintiffs, Smart Correction copies the process described in the '377 Patent.[2]

## II.    PROCEDURAL POSTURE

The parties are currently engaged in discovery related to Plaintiffs' patent infringement claims[3] following the Court's claim construction, or *Markman*, order entered on October 4, 2022 [DE 118]. A stipulated protective order governs the

---

[1] The '377 Patent is entitled "Point and Click Alignment Method for Orthopedic Surgeons, and Surgical and Clinical Accessories and Devices." [DE 1-4].

[2] Defendant Nick Deeter, a former employee of OrthoPediatrics, is a founding member and current CEO of WishBone. OrthoPediatrics also maintains a breach of contract claim against Mr. Deeter. [*See* DE 33 at 40; DE 68 at 30]. As the discovery dispute at issue in the instant motion only relates to the infringement claims, no further development of the contract claim is necessary.

[3] Count I of Plaintiffs' operative amended complaint raises a claim for infringement of the '377 Patent against WishBone while Count II seeks declaratory judgment that WishBone infringed the '377 Patent. [DE 33 at 26, 37].

production, exchange, and designation of confidential and highly-confidential, attorneys' eyes only materials throughout this action. [DE 108].

Since September 16, 2021, when Plaintiffs served their first 30 requests for production upon Defendants, production of responsive materials has been the source of significant contention among the parties. On November 16, 2021, Defendants served responses to Plaintiffs' first requests asserting blanket objections to multiple requests on grounds of relevance, overbreadth, lack of specificity, or undue burden. Plaintiffs served their second requests for production on January 21, 2022, with a letter outlining deficiencies in Defendants' responses to date and 15 additional requests for production. On February 22, 2022, Defendants responded to Plaintiffs' second requests raising objections to each request.

As discovery continued, the parties jointly sought extension of the discovery deadlines by motion on October 24, 2022. In that motion, the parties reported that Defendants expected to complete their discovery productions before the middle of November 2022. After the middle of November passed, Plaintiffs still found Defendants' production incomplete leading them to file the instant Motion to Compel on December 2, 2022, after attempts to resolve the dispute themselves. Alleging superfluous production and technical deficiencies, Plaintiffs contend that Defendants have stonewalled discovery by withholding or otherwise failing to locate and produce information responsive to their requests for production. Plaintiffs argue that Defendants' outstanding discovery responses include information critical to their

infringement claims, damages theories, and secondary considerations of non-obviousness[4].

Defendants, however, argue that the breadth of Plaintiffs' requests has caused the discovery delays. Defendants contend that Plaintiffs are asking for wholly irrelevant information and have "regularly expanded the breadth of their requests in email exchanges between counsel . . . ." [DE 125 at 5-6]. Defendants also assert that they have been unable to satisfy Plaintiffs' demands, despite working diligently to do so with at least five supplemental productions in November and December 2022. Without withdrawing their relevance and overbreadth objections, Defendants also request bifurcation of discovery to avoid potentially unnecessary and burdensome damages-related discovery because they perceive a high probability of prevailing on the infringement claims. Plaintiffs oppose bifurcation and reiterate the continued deficiencies in Defendants' discovery production. Bifurcation will be addressed first.

## III.   BIFURCATION

Bifurcation may be ordered "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Bifurcation is the exception, rather than the rule, in patent cases. "A single trial generally tends to lessen the delay, expense, and inconvenience to all concerned." *THK Am., Inc. v. NSK Co.*, 151 F.R.D. 625, 631 (N.D. Ill. 1993). In deciding whether to grant bifurcation, the Court must consider whether

---

[4] In assessing the obviousness of a patent, courts looks to several factors including "[s]uch secondary considerations as commercial success, long felt but unsolved needs, [and] failure of others." *Days Corp. v. Lippert Components, Inc.*, CAUSE NO. 3:17CV208-PPS/MGG, CAUSE NO. 3:17CV327-PPS/MGG, 2022 WL 1237433, at *2 (N.D. Ind. Apr. 27, 2022) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). An obviousness analysis would be relevant to an invalidity defense. *See* 35 U.S.C. § 103.

separate trials would prevent prejudice to a party or promote judicial economy. *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007); *see also, e.g., Saunders v. Metro. Prop. Mgmt., Inc.*, 561 F. Supp. 3d 629, 631 (W.D. Va. 2021) (emphasizing the importance of prejudice toward the non-moving party in deciding bifurcation). The moving party has the burden of demonstrating that bifurcation is appropriate based on the circumstances of the case. *CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Assocs.*, 389 B.R. 76, 81 (N.D. Ill. 2008). Ultimately, the Court retains discretion to decide whether to grant or deny bifurcation. *Rodriguez v. City of Chicago*, 429 F. Supp. 3d 537, 540 (N.D. Ill. 2019) (citing *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013)).

Here, Defendants have failed to demonstrate that bifurcation will promote judicial economy or prevent prejudice to the parties in this case, as required by Rule 42(b). Defendants primarily rely on their conclusion that they have a "high probability of prevailing on the infringement issue" in support of their bifurcation argument. The probability of prevailing on infringement is indeed relevant to the bifurcation analysis since defeating the infringement claims would obviate the need for damages discovery. And if damages discovery can be avoided, the burden on the parties and the Court would be reduced while also expediting the adjudication of the infringement claims. *See Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 622 (N.D. Ill. 2000).

To show a high probability of prevailing on infringement, Defendants direct the Court's attention to their invalidity defense, which they contend is supported by recently uncovered dispositive evidence revealing public use of Smart Correction. Defendants cite 2011 advertisements for Smart Correction in an orthopedic trade

5

journal; a 2009 PowerPoint, modified in 2011, showing step-by-step use of Smart Correction; a 2012 PowerPoint showing steps of Smart Correction; and a video of a 2012 correction using Smart Correction.

Public use of a claimed invention before its effective filing dates precludes patentability. 35 U.S.C. § 102(a)(1). Therefore, if Defendants establish public use of Smart Correction before September 29, 2014, when the application for the '377 Patent was filed, their invalidity defense would succeed thereby overcoming Plaintiffs' infringement claims and mooting any need for the damages discovery at issue in the instant Motion to Compel. Defendants' burden of proof, however, is high.

Patents are presumed valid. 35 U.S.C. § 282. As such, the party asserting invalidity bears the burden of proving a patent's invalidity claim by clear and convincing evidence. *Id.*; *see also Microsoft Corp. v. I4I Ltd. Partnership*, 564 U.S. 91, 95, 97–98 (2011). Any reliance on the accused infringer's prior use to defeat an infringement claim, also called a "practicing the prior art" defense, amounts to an invalidity defense subject to the clear and convincing evidence standard. *See 01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 741–42 (Fed. Cir. 2018) (citing *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002)).

Defendants argue that Smart Correction does not infringe the '377 Patent because it practices prior art and invalidates the Patent based on its previous public use. To prevail, Defendants must prove the public use by clear and convincing evidence. As a result, whether the requested bifurcation would promote judicial economy is dependent

whether Defendants' cited evidence—ads, PowerPoints, and video—suggests a high probability of establishing invalidity by public use by clear and convincing evidence.

The analysis of a prior public use claim is highly fact-specific, and includes considerations such as, "the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed on members of the public who observed the use; and commercial exploitation." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). Public use must be "by a person other than the inventor who is 'under no limitation, restriction, or obligation of secrecy to the inventor,'" and must include "all [of] the claim limitations." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1377 (Fed. Cir. 2011). Yet, Defendants offer no explanation as to how the ads, PowerPoints, and video address the extent of availability to the public, any confidentiality obligations involved, or how the product described in these materials compares to each claim limitation in the '377 Patent. Moreover, "[t]he mere display of an invention does not constitute public use" and Defendants have not linked the advertisements to public use beyond their mere existence. *BNJ Leasing, Inc. v. Portabull Fuel Serv., LLC*, 591 F. Supp. 3d 125, 152 (S.D. Miss. 2022) (citing *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007)). Without more, Defendants have not demonstrated a high probability of presenting clear and convincing evidence of invalidity by prior public use.

Alternatively, Defendants state—in a single sentence—that there can be no infringement to the extent Smart Correction does not meet the limitations of Claim 1 in the '377 Patent. Defendants seem to imply a high probability of success based upon a

literal infringement defense. Literal infringement "exists if each of the limitations of the asserted claim(s) . . . are found in . . . the accused device." *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995); *see also 01 Communique Lab'y, Inc.*, 889 F.3d at 741. The burden of proof for a literal infringement defense is the less-stringent, preponderance of the evidence standard. *See 01 Communique Lab'y, Inc.*, 889 F.3d at 741–42 (citing *Tate Access Floors, Inc.*, 279 F.3d at 1365). However, Defendants provide nothing to suggest even one limitations in an asserted claim is absent in Smart Correction. As such, Defendants have waived any such argument by failing to develop it. *See United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017). This Court's *Markman* ruling also weighs against bifurcation as all disputed matters were decided in Plaintiff's favor. [*See* DE 118]; *cf. Real*, 195 F.R.D. at 622 (denying bifurcation in part because "the *Markman* ruling was in Plaintiff's favor on all nine disputed issues" even though no opinion had been "issued expressly regarding the probability of success at trial").

Thus, the record fails to depict a high probability of Defendants' overcoming Plaintiffs' infringement claims with an invalidity or literal infringement defense. Accordingly, Defendants have not shown that bifurcation of damages discovery would promote judicial economy. In fact, bifurcation could prolong the adjudication of this case and decrease efficiencies by requiring witnesses to be deposed twice and the seating of two separate juries. Defendants' prejudice arguments fare no better.

Prejudice is the most important consideration when weighing the competing interests for bifurcation under Rule 42(b). *BASF Catalysts LLC v. Aristo, Inc.*, No. 2:07-CV-222, 2009 WL 523123, at *2 (N.D. Ind. Mar. 2, 2009). Concerns include "the possible

prejudice of jury confusion on complex issues if bifurcation is denied, and . . . the prejudice of considerable delay resulting if bifurcation of liability and damages is granted." *Id.* (citing *Real,* 195 F.R.D. at 621). Jury instructions and other directives can mitigate any prejudicial jury confusion. *Real,* 195 F.R.D. at 621. The prejudice of delay arising from bifurcation, however, can only be cured by denying bifurcation. *Id.*

Defendants do not mention jury confusion but argue that damages discovery now will impose undue financial burden on them because Plaintiffs' damages theories are complex and will necessitate a high volume of production, including disclosure of confidential company information to Plaintiffs who are their market competitors. But Plaintiffs' infringement claims involve one patent and one accused product, and Defendants have not demonstrated that damages calculations under any theory would be more complex than the average patent case. *See BASF Catalysts LLC*, 2009 WL 523123, at *3. Further, the Court has already issued an extremely comprehensive protective order, to which Defendants agreed, authorizing designation of many categories of "Highly Confidential Attorneys' Eyes Only" information that cannot be disclosed to any opposing party. [DE 108 at 3–4]. Thus, measures are in place to protect WishBone from disclosure of its confidential business information to Plaintiffs.

Plus, Defendants have not adequately accounted for the prejudice to Plaintiffs if bifurcation is granted. Bifurcation will undoubtedly delay adjudication of Plaintiffs' claims. Witnesses with information about both liability and damages will likely need to be deposed twice increasing the risk of further discovery motions. Non-party witnesses, including Defendants' investors, would be similarly burdened by bifurcation. Thus, the

prejudice to Plaintiffs from bifurcation, which is harder if not impossible to mitigate, exceeds any prejudice to Defendants from proceeding with damages discovery now in this single patent, single accused product patent infringement case.

As Defendants have failed to show that bifurcation would promote judicial economy or avoid significant prejudice, bifurcation is not warranted.

## IV.    MOTION TO COMPEL[5]

The parties dispute whether Defendants' responses to Plaintiffs' requests for production, specifically Requests 2, 15, 16, 19, 27, 32, 33, 34, and 44, are complete. The parties disagree as to the proper scope of discovery and the adequacy of Defendants' efforts to locate and produce information responsive to Plaintiffs' Requests.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." A party may file a motion to compel to challenge the sufficiency of a discovery response. Fed. R. Civ. P. 37(a). The party requesting discovery bears the initial burden of demonstrating relevance after which the burden shifts to the objecting party to show why a particular request for discovery is improper. *Bell v. Pension Comm. of ATH Holding Co., LLC*, 330 F.R.D. 517, 520 (S.D. Ind. 2018).

The Court exercises broad discretion in determining the scope of discovery and "relevancy is construed broadly." *McGrath v. Everest Nat. Ins. Co.*, 625 F. Supp. 2d 660, 669 (N.D. Ind. 2008). During discovery, information that informs the broader subject

---

[5] Plaintiffs satisfied the meet and confer requirement of N.D. Ind. L.R. 37-1 with documentation of attempts to resolve the dispute without court intervention. [*See* DE 124-7].

matter may be relevant even if not directly related to the claims or defenses at issue. *Yessenow v. Hudson*, 270 F.R.D. 422, 426–27 (N.D. Ind. 2010). Proportionality is determined by assessing "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Courts weigh "the value of the material sought against the burden of providing it" in light of the public interest in the truth underlying case at hand. *Berning v. UAW Local 2209*, 242 F.R.D. 510, 512 (N.D. Ind. 2007). Ultimately, the Court has discretion to tailor the scope of discovery to the unique circumstances of each case.

Here, Plaintiffs ask the Court to compel production of two primary categories of documents, loosely labelled as "financial documents" and "marketing and third party communication documents." Among the "financial documents" Plaintiffs seek are documents showing WishBone's annual revenue and sales, invoices corresponding to a spreadsheet produced by Defendants, and certain large group purchasing agreements. Plaintiffs' seek "marketing and third party communications" in the form of marketing and training documents used by WishBone at trade conferences; educational and training materials given to medical providers and sales representatives; and documents used to secure investor funding.

## A.    Financial Documents

Plaintiffs ask the Court compel Defendants to produce financial documents responsive to Requests 2, 33, and 44.

### 1. Request 44 — Annual Revenue and Sales by Product

In Request 44, Plaintiffs ask for "[d]ocuments sufficient to show [their] annual revenue and sales, by product, from January 21, 2016, to present" from Defendants. [DE 124-3 at 9]. Plaintiffs want documents associated with all product lines, not just Smart Correction. Plaintiffs argue that financial information regarding the broader product lines is relevant and necessary to develop and present damages theories, including "enhanced profits for willfulness, reasonable royalty, lost profits, potential price erosion, conveyed sales, or Defendants' use of tax benefits for gifts or donated supplies or international sales to mask actual domestic uses or sales of the accused system." [DE 124 at 9]. At first, Defendants objected to Request 44 as overly broad and unduly burdensome because it requests information about products unrelated to Smart Correction. Defendants refuse to withdraw their objections but produced the requested information on December 16, 2022. Plaintiffs acknowledge the production in the form of a spreadsheet showing the full company wide sales.

With Defendants' supplemental production, there appears to be no further information responsive to Request 44 for this Court to compel. Any of Defendants' remaining concerns about relevance and admissibility of the information they have produced need not be resolved here. Yet, nothing in this Opinion and Order stops either party from challenging the admissibility of these documents later in this litigation.

### 2. Requests 2 & 33 — Invoices

In response to Plaintiffs' Requests 2 and 33, Defendants produced a sales and revenue spreadsheet logging invoices associated with Smart Correction. Defendants did

not, however, produce the invoices themselves. Defendants only question the relevance of financial information beyond the scope of Smart Correction without explicitly objecting to producing the invoices.

Defendants' failure to produce the invoices is confusing as Requests 2 and 33 only ask for documents related to sales of Smart Correction, including financial records. [*See* DE 124-1 at 7 (Request 2); DE 124-3 at 7 (Request 33)]. As nothing in the record suggests that producing the invoices would be unduly burdensome or disproportional to the needs of this case, Defendants must produce them.

### 3.     Request 33—Large Group Purchasing Agreements

Plaintiffs' Request 33 also seeks documents related to agreements involving Smart Correction. Plaintiffs contend the agreements are relevant to their damages calculations because they relate to the sales of all components of Smart Correction. While Defendants claim they've already produced all sales or distribution agreements for Smart Correction in their possession, custody, or control, they admit to withholding certain sales and distribution agreements with large group purchasing organizations. Defendants argue that the withheld agreements involve WishBone's entire product line, not just Smart Correction. Further, Defendants contend that these agreements include highly-sensitive—and highly prejudicial—confidential sales information, with no specific relation to Smart Correction.

As already discussed, the Court's protective order provides protection for WishBone's confidential business information by severely limiting its disclosure. *Supra* p. 9. Thus, Defendants' confidentiality arguments here are not persuasive. Moreover,

13

Defendants do not dispute that the withheld agreements relate to components of Smart Correction or describe deals where Smart Correction played a role in developing general valuations. Therefore, the finite volume of WishBone's readily identifiable and relevant large group purchasing agreements responsive to Plaintiffs' Request 33 are both relevant and proportional to the needs of this case and should be produced.

### B.  Marketing and Third-Party Communication Documents

Plaintiffs also ask the Court to compel information regarding marketing efforts and third-party communications by WishBone about Smart Correction. Since Plaintiffs filed their Motion to Compel, Defendants agreed to produce Smart Correction marketing or training documents used by WishBone at two trade conferences—the Baltimore Limb Deformity Course and IPOS Conferences. Thus, any dispute over the marketing and training information from those conferences needs no further attention here. All that remains for consideration is Plaintiffs' request for third party communications about Smart Correction including educational and training materials for hospital administrators, surgeons, and sales representatives and information WishBone shared with the private investors at Luther King Capital Management and LKCM Headwater Investments in October 2020, August 2021, and December 2022.

### 1.  Educational and Training Materials

Plaintiffs' Request 27 asks Defendants to produce "[a]ll Communications with third parties regarding the Accused System, including all customers, potential customers, medical facilities, physicians, surgeons, or other medical personnel." [DE 124-1 at 11]. In their Motion, Plaintiffs seek WishBone documents created to train and

educate assorted medical professionals and administrators, as well as its own sales and marketing staffs, on Smart Correction arguing they are relevant to the infringement claims, damages theories, and secondary considerations of non-obviousness. Defendants' response did not address these educational and training materials. As such, Defendants have not demonstrated that Request 27 is improper. *See Bell*, 330 F.R.D. at 520. They have also waived any such argument for by failing to develop it. *See Parkhurst*, 865 F.3d at 524. Therefore, Defendants must produce any educational and training materials regarding Smart Correction.

### 2. Investor Information

Plaintiffs lastly ask the Court to compel documents Defendants used to solicit investment in WishBone from the investment firms Luther King Capital Management and LKCM Headwater Investments in October 2020, August 2021, and December 2022. Plaintiffs contend that Defendants would have created documents for the prospective investors that would have reflected Smart Correction revenue, profitability valuations, and business risk analyses that would be relevant to infringement, damages, secondary considerations of non-obviousness, and willful infringement. Defendants object to producing the investor information because Plaintiffs' requests for production did not ask for investor information. Defendants also argue that the requested documents include information regarding WishBone's entire financial picture without any showing from Plaintiffs that company-wide financials are relevant to the claims in contention. Further, Defendants maintain that Plaintiffs have not adequately developed a damages

theory to demonstrate their need for this information, which includes confidential—and

prejudicial—company information.

### a.     Content of Plaintiffs' Requests for Production

Plaintiffs claim that the requested investor documents are responsive to Requests

2, 15, 16, 19, 27, 32, 34[6]. In their Motion, Plaintiffs ask for documents Defendants used to

---

[6]     **REQUEST** FOR **PRODUCTION NO. 2:**
Documents relating to the policies, strategies, financial records, and/or business plans of
Defendants and any subsidiary thereof, regarding the Accused System.
. . . .
**REQUEST FOR PRODUCTION NO. 15:**
All Documents and Communications related to advertising or marketing of the Accused
System, including all descriptive or promotional materials concerning the Accused
System, press releases and trade journal articles describing the Accused System,
advertisements, catalogs, materials prepared for use in trade meetings and conventions,
package inserts, technical data sheets, specifications, price lists, sales presentations to
customers or potential customers and any other materials promoting or describing the
Accused System.
. . . .
**REQUEST FOR PRODUCTION NO. 16:**
Documents sufficient to identify Your current and expected sales volume and sales
revenue for the Accused System in the United States in terms of unit and dollar amount,
including but not limited to Your expected gross revenues.
. . . .
**REQUEST FOR PRODUCTION NO. 19:**
All Documents referring or relating to any market studies, reports, or analyses
concerning product design, competition, consumer surveys, consultant surveys,
advertising campaigns, promotional or sales training material, market segments, market
share, projections of that market share, or market revenue (actual or predicted),
concerning the Accused System.
. . . .
**REQUEST FOR PRODUCTION NO. 27:**
All Communications with third parties regarding the Accused System, including all
customers, potential customers, medical facilities, physicians, surgeons, or other medical
personnel.
. . . .
**REQUEST FOR PRODUCTION NO. 32:**
All documents and things relating to studies, analyses, evaluations, testing, or
investigations of the Accused System, conducted by or on behalf of You.
. . . .
**REQUEST FOR PRODUCTION NO. 34:**
All documents and things relating to studies, analyses, evaluations, testing, or
investigations conducted by or on Your behalf relating to the Asserted Patents.
[DE 104-1 at 7, 9, 10, 11; DE 104-3 at 7].

secure investor funding that relate to "their revenue," "valuations of Smart Correction as a profitable product line," and "information about what freedom to operate, intellectual property, and competitor analysis Defendants' conducted in assessing their business risks associated with Smart Correction." [DE 124 at 15]. In their reply, Plaintiffs clarify that they only want documents "associated with the accused system" that were exchanged with investors. [DE 126 at 8].

The scope of relevant discovery is construed broadly. *McGrath*, 625 F. Supp. 2d at 669. As such, Plaintiffs' requests need not have explicitly requested investor-related documents for them to be responsive. At the least, the requested investor information—narrowly tailored to Smart Correction—falls into the categories of (1) policies, strategies, financial records, and/or business plans responsive to Request 2; (2) market studies, reports, or analyses responsive to Request 19; and (3) studies, analyses, evaluations, testing, or investigations responsive to Request 34. Defendants do not challenge the propriety of these requests. Therefore, Defendants must produce the requested investor information to the extent it falls into these categories and is nonprivileged, relevant, and proportional to the needs of this case. *See* Fed. R. Civ. P. 26(b).

### b.    Relevance

Plaintiffs claim that the requested investor documents are relevant, especially to damages calculations. Plaintiffs identify several potential damages theories they are exploring as referenced above. *See supra* p. 12. In support, Plaintiffs assert they need the requested investor information to assess reasonable royalty damages based on the 15

factors delineated in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120

(S.D.N.Y. 1970); lost profits damages under the four-factor test set forth in *Panduit Corp.*

*v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978); and lost profits damages

based on market share as considered in *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1376–

1378 (Fed. Cir. 2003). Defendants object to producing the company-wide financial

information embedded in the investor documents just to help Plaintiffs flesh out their

damages theories.

Indeed, some courts have disallowed production of information showing a

company's total financial picture in particular patent cases. *See, e.g.*, *Generac Power Sys.,*

*Inc. v. Kohler Co.*, No. 11-CV-1120-JPS, 2012 WL 2049945, at *3 (E.D. Wis. June 6, 2012);

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, CIVIL NO. 1:CV-09-1685,

at *1 (M.D. Pa. Dec. 21, 2011). In *Generac Power Systems*, the patent holder sought

disclosure of the alleged infringer's "cost bases, balance sheets, annual reports, and

other critical documents." 2012 WL 2049945, at *3. The court refused to demand

disclosure of the alleged infringer's company-wide financials as irrelevant to the

allegedly infringing product and too sensitive to risk the prejudicial effect of release to a

direct competitor. *Id.*

The court in *Kimberly-Clark Worldwide* discussed the relevance of broader

financial information to reasonably royalty and willful infringement damages theories.

2011 WL 13199148, at *1–*2. The court denied the patent holder's motion to compel

based on relevancy conclusions reached after considering the unique circumstances of

the alleged infringement and the particulars of the parties' dueling arguments. *Id.* As to

reasonably royalty damages, the court found the patent holder's argument for higher level financial documents unsupported. *Id.* at *1. The court relied on a similar rationale in considering willful infringement damages then found relevance too marginal or speculative to overcome the potential harm to the alleged infringer from disclosure of the company's sensitive information. *Id.* at *2.

From these two cases, Defendants glean a presumption against production of company-wide financial information generally. However, another court in this Circuit reviewed those cases in 2021 and disavowed any such presumption. *Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18 C 8175, 2021 WL 4516413, at *3 (July 14, 2021 N.D. Ill.). The *Kove IO* court compared the requested financial information to the damages theories it could help prove. *Id.* at *3–*4 (discussing arguments related to certain *Georgia-Pacific* factors for reasonable royalties and to convoyed sales damages). The court concluded that "high-level financial records that contain aggregate data about products in the same unit as the accused products" was discoverable in that case. *Id.* at *4. In doing so, the *Kove IO* court distinguished *Generac Power Systems*, *Kimberly-Clark Worldwide*, and other similar cases thereby asserting the role of courts to determine on a case-by-case basis whether the requested financial information—even information painting a clear picture of a company's total financial condition—is relevant to a damages theory.

Indeed, broad discovery is important, especially in patent cases, even if limited to information relevant to claims and defenses. *Id.* at *2 (citing *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04C5312, 2005 WL 1300778, at *1 (N.D. Ill. Apr. 28, 2005). Thus, as the

*Kove IO* court shows, a patent holder's request for an alleged infringer's broad financial information should not be dismissed out of hand, but rather considered carefully for relevance to damages relative to the particular facts of a case.

Defendants acknowledge *Kove IO*, but argue its facts are distinguishable from the situation in this case such that discovery of company-wide financials is not warranted here. Specifically, Defendants argue that the court in *Kove IO*, and courts like it finding company-wide financials relevant, were presented with more developed damages theories than Plaintiffs present here. *See Kove IO*, 2021 WL 4516413, at *1. In support, Defendants also cite to *Generac Power Systems* and *Kimberly-Clark Worldwide*. Yet none of these three cases required the patent holder to define a single damages theory during discovery. In fact, the *Kove IO* court opined without question on more than one damages theory while noting that the patent holder did not need to prove its damages theory on the merits to get access to the requested financial information. 2021 WL 4516413, at *5.

Moreover, the very nature of patent damages is highly dependent upon the unique circumstances of each case. *See Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996). Damages for patent infringement must be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court. 35 U.S.C. § 284. This statutory floor of damages leaves the door open for consideration of any damages theory that adequately compensates the patent holder for infringement. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964);

*cf. Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1327–30 (Fed. Cir. 2014). And Plaintiffs have articulated explicitly that they are pursuing reasonably royalty, lost profits, and convoyed sales damages theories among others. *Accord Ericsson, Inc.*, 352 F.3d at 1376–79 (reviewing a jury's consideration and award of patent damages under multiple theories, including lost profits due to lost sales, lost profits due to price erosion, and reasonable royalty).

Thus, Defendants have neither established that Plaintiffs must limit their damages theory during discovery or that they have not identified damages theories they are exploring. That leaves the question of whether the requested investor information, which includes highly-sensitive financial information about WishBone's total financial picture, is relevant to the claims and defenses in this case.

The *Kove IO* court provides insight into the relevance by distinguishing cases that involved requests for granular data about noninfringing products from requests for "high-level financial records contain[ing] aggregate data about products in the same unit as the accused products." 2021 WL 4516413, at *4. The court discussed *RTC Industries, Inc. v. Fasteners for Retail, Inc.*, in which the court denied a motion to compel involving the plaintiff's "request for production of all sales of any product sold to a [defendant] customer that purchased an Accused Product." No. 17 C 3595, 2019 WL 13133360, at *1 (N.D. Ill. Nov. 26, 2019). The *RTC Industries* court reasoned that the patent holder making the request failed to provide anything to show the accused product was associated with selling completely unrelated products to those customers. Here, Plaintiffs' request for investor documents, unlike the patent holder's requests in

21

*RTC Industries*, seeks broader financial information reflected in communications to prospective investors that includes information about Smart Correction and related products. As Plaintiffs suggest, this information could shed light on damages by clarifying the role Smart Correction played in securing investments from Luther King Capital Management and LKCM Headwater Investments.

Other cases also support finding Plaintiffs' requested investor information relevant to damages. In *Minks v. Polaris Industries, Inc.*, the Federal Circuit considered the sixth *Georgia-Pacific* factor, which looks to "the effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of the licensee; and the extent of such derivative or convoyed sales" to find that evidence of negotiations that secured sales of non-patented items could support a reasonable royalty rate higher than the rate established in the license. 546 F.3d 1364, 1372 (Fed. Cir. 2008) (quoting *Georgia-Pacific*, 318 F. Supp. at 1120). Another court found that "the profitability of the accused product [was] likely relevant to the determination of willful infringement, as greater profitability translates into a possible financial motive for knowingly infringing." *JAB Distribs., LLC v. London Luxury, LLC*, No. 09-CV-5831, 2010 WL 4008193, at *5 (N.D. Ill. Oct. 13, 2010). Yet another court considered convoyed or bundled sales in the hypothetical negotiation of a reasonable royalty rate. *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-03999-BLF, 2015 WL 4272870, at *9-10 (N.D. Cal. July 14, 2015).

While the requested investor information is relevant for discovery purposes, Plaintiffs will likely need to focus and develop other damages theories further before

reaching any dispositive stage of litigation on the merits. *See Kove IO*, 2021 WL 4516413, at *4. In the meantime, the only issue that could still preclude Defendants' production of the requested investor information is proportionality.

c.      **Proportionality**

The proportionality of Plaintiffs' requests for investor information turns mostly on Defendants' concerns about disclosure of its highly-sensitive financial information to a direct competitor. In ruling on similar discovery disputes, courts have found that the defendant's "understandable concerns over its sensitive company-wide financial information are adequately addressed by the protective order already in place in this matter." *Kimberly-Clark Worldwide, Inc.*, 2011 WL 3240452, at *2; *see also JAB Distributors, LLC*, 2010 WL 4008193, at *3 (N.D. Ill. Oct. 13, 2010) (noting that parties' relationship as competitors cannot, on its own, cannot justify withholding otherwise discoverable information). As previously discussed, the stipulated protective order entered by this Court allows for designation of information as Highly Confidential—Attorney's Eyes Only that precludes disclosure to the parties themselves. *Supra* p. 9, 14. Moreover, nothing prevents any party or member of the public from challenging such a designation. Thus, the protective order simultaneously preserves the confidentiality of any designated information while ensuring the parties can access the information needed to pursue their claims and defenses.

Additionally, Defendants have not shown any undue burden related to production of the requested investor information. The requests are limited to information involving investor documents from specific time periods with named

23

investors, corresponding to articles posted on WishBone's website in October 2020, August 2021, and December 2022. This implies a limited volume of documents that should be readily identifiable by Defendants.

Therefore, the requested investor information is both relevant and proportional to the needs of this case and must be produced by Defendants.

### C.    Attorney's Fees

Plaintiffs request that the Court award their attorneys' fees incurred in bringing the instant Motion to Compel, pursuant to Rule 37. When a motion to compel is resolved, the court must award the prevailing party its reasonable expenses incurred in making the motion, including attorney's fees, unless certain exceptions apply. Fed. R. Civ. P. 37(a)(5)(A)-(B). Such an award should be denied if, as applicable here, "the opposing party's nondisclosure, response, or objection was substantially justified; or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii)-(iii). Defendants contend that their nondisclosures, responses, and objections are substantially justified because there was a reasonable dispute on the appropriateness of Plaintiffs' requests and the discoverability of the requested documents. The Court agrees. *See Senior Lifestyle Corp. v. Key Benefit Admin'rs, Inc.*, No. 1:17-cv-02457-JMS-MJD, 2019 WL 5565973, at *3 (S.D. Ind. Mar. 29, 2019) ("For substantial justification to exist, there must be "a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action." (internal quotations omitted)). Therefore, the parties are responsible for their own costs in litigating the instant Motion to Compel.

## V.    CONCLUSION

For the reasons discussed above, Plaintiffs' Motion to Compel is **GRANTED IN PART** and **DENIED IN PART**. [DE 124].

Defendants' request for bifurcation of damages-related discovery is **DENIED**. Plaintiffs' requests for annual revenue and sales by product (Request 44) and marketing or training documents used by WishBone at the Baltimore Limb Deformity Court and IPOS Conferences are **DENIED AS MOOT**. Plaintiffs' requests for educational and training materials (Request 27) and investor information (Requests 2, 19, 34) are **GRANTED**.

Accordingly, Defendants are **ORDERED** to produce the responsive educational and training materials and investor information, as discussed above, on or before **August 21, 2023**, along with an affidavit affirming that they have collected and produced all information responsive to Plaintiffs' discovery requests. Supplementation of discovery responses shall continue consistent with Fed. R. Civ. P. 26(e) through trial.

**SO ORDERED** this 31st day of July 2023.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge